## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:

DEMERX, INC.,                                          Case No.: 18-14149-RAM
                                                       Chapter 11

      Debtor.

_____/

## DEBTOR'S FIRST AMENDED COMBINED PLAN OF
## REORGANIZATION AND DISCLOSURE STATEMENT[1]

Submitted by: DemeRx, Inc.

Dated: January 30, 2019

Respectfully submitted,

**Aaronson Schantz Beiley P.A.**

/s/ Geoffrey S. Aaronson
Geoffrey S. Aaronson, Esq.
Florida Bar No. 349623
gaaronson@aspalaw.com
Samuel J. Capuano, Esq.
Florida Bar No. 90946
scapuano@aspalaw.com
One Biscayne Tower
2 S. Biscayne Blvd, 34th Floor
Miami, Florida 33131
Ph: 786.594.3000
Fax: 305.424.9336
*Attorneys for Debtor*

---

[1] On August 20, 2018, at a time when the Debtor was designated a "small business debtor" as that term is defined in Section 101(51) of the Bankruptcy Code, the Debtor filed its initial Combined Plan of Reorganization and Disclosure Statement [ECF 73] (the "Initial Small Business Plan"). On August 23, 2018, the Court entered an order terminating the Debtor's designation as a "small business debtor." Thereafter, on September 14, 2018, the Debtor filed a subsequent Combined Plan of Reorganization and Disclosure Statement [ECF 98] (the "Initial Plan"). This First Amended Combined Plan of Reorganization and Disclosure Statement amends the Initial Plan.

## Table of Contents

**ARTICLE I: INTRODUCTION** ................................................................. **1**

**ARTICLE II: DEFINITIONS** .................................................................. **2**

**ARTICLE III: DISCLOSURES AND VOTING PROCEDURES** ................. **10**

   **3.1.**   **Voting** ...................................................................................... 12

      3.1.1.   Ballots ............................................................................. 12

      3.1.2.   Returning Ballots ........................................................... 12

   **3.2.**   **Objections to the Plan** .......................................................... 12

**ARTICLE IV: BACKGROUND OF THE DEBTOR'S BUSINESS** ............... **14**

   **4.1.**   **Description of the Debtor** ..................................................... 14

   **4.2.**   **Corporate History of the Debtor and Current Officers and Directors** .................. 15

   **4.3.**   **The Debtor's Pre-Petition Shareholders** ............................. 16

   **4.4.**   **The Debtor's Pre-Petition Debt** ........................................... 16

   **4.5.**   **The Pre-Petition Rights Offering** ........................................ 16

   **4.6.**   **Significant Chapter 11 Events** ............................................. 17

      4.6.1.   DIP Facility ..................................................................... 17

      4.6.2.   Retention of Counsel and Other Chapter 11 Matters ......... 19

      4.6.3.   Compromises with Foley & Lardner and Shaya Yaki ......... 20

**ARTICLE V: SUMMARY OF BANKRUPTCY AND CHAPTER 11 PROCEDURE** ....... **22**

   **5.1.**   **Property of the Estate** ........................................................... 22

   **5.2.**   **Automatic Stay** ...................................................................... 22

   **5.3.**   **Plan of Reorganization** ......................................................... 22

   **5.4.**   **Disclosure Statement** ............................................................ 22

   **5.5.**   **Acceptance and Confirmation of Plan** ................................. 22

   **5.6.**   **Voting** ...................................................................................... 25

      5.6.1.   Who May Vote or Object? ............................................... 25

      5.6.2.   What Is an Allowed Claim or an Allowed Equity Interest? ..... 25

      5.6.3.   What Is an Impaired Claim or Impaired Equity Interest? ..... 25

      5.6.4.   Who is NOT Entitled to Vote? ........................................ 25

      5.6.5.   Who Can Vote in More Than One Class? ......................... 26

      5.6.6.   Votes Necessary to Confirm the Plan ............................... 26

      5.6.7.   Impairment ..................................................................... 26

      5.6.8.   Confirmation Standards ................................................... 27

**ARTICLE VI: OUTLINE OF THE PLAN** ............................................. **28**

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

**6.1.    Summary of Payments and Conversion Rights Under the Plan** ............................ 28

**6.2.    Allowed Administrative Expenses** ................................................................ 29

**6.3.    New Common Stock in the Debtor** ................................................................ 31

**6.4.    The Liquidating Trust** ................................................................................ 31

    6.4.1.    Establishment of the Liquidating Trust .................................................. 31

    6.4.2.    Purpose of the Liquidating Trust .......................................................... 31

    6.4.3.    Liquidating Trust Management ............................................................ 32

    6.4.4.    Liquidating Trust Structure ................................................................. 32

    6.4.5.    Costs and Expenses of the Liquidating Trust. ......................................... 32

    6.4.6.    Compensation of Professionals Retained by the Liquidating Trustee .................. 32

    6.4.7.    Resignation and Removal of the Liquidating Trustee ................................ 33

    6.4.8.    Continuation of Automatic Stay ........................................................... 33

    6.4.9.    Closing of the Chapter 11 Case ........................................................... 33

**6.5.    Post-Confirmation Litigation Claims** ............................................................ 34

    6.5.1.    Transfer and Enforcement of Causes of Action ........................................ 34

    6.5.2.    Objections to Claims ......................................................................... 34

**ARTICLE VII: ADMINISTRATIVE CLAIMS AND OPERATING EXPENSES** ............. **34**

**7.1.    Administrative Claims** ............................................................................... 34

    7.1.1.    Ongoing Operating Costs of Business ................................................... 34

    7.1.2.    Professional Fees – ASBPA ............................................................... 35

    7.1.3.    United States Trustee Fees ................................................................. 35

    7.1.4.    Treatment of Administrative Claims ..................................................... 35

    7.1.5.    Payment ......................................................................................... 36

**ARTICLE VIII: CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ................................................................................................ **36**

**8.1.    Classification and Impairment of Claims** ...................................................... 36

    8.1.1.    Delineation .................................................................................... 36

**8.2.    Treatment** ............................................................................................... 36

**8.3.    Classification and Impairment of Claims** ...................................................... 38

**ARTICLE IX: ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS** ............. **39**

**9.1.    Dismissal** ................................................................................................ 39

**9.2.    Chapter 7 Liquidation** ............................................................................... 39

**9.3.    Risk Analysis** .......................................................................................... 40

**ARTICLE X: CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** .................. **40**

**10.1.    U.S. Federal Income Tax Consequences to the Debtor** ..................................... 41

iii

**10.2.** **U.S. Federal Income Tax Consequences to an Investor Typical of the Holders of Claims and Interests** ............................................................................................ 42

**10.3.** **Gain or Loss Recognition on the Satisfaction of Claims and Character of Gain or Loss** 42

**10.4.** **Holders of Disputed Claims** ........................................................................... 42

**10.5.** **Information Reporting and Backup Withholding** ........................................ 43

**10.6.** **Importance of Obtaining Professional Tax Assistance** ............................... 43

**10.7.** **Circular 230 Disclaimer** ................................................................................. 43

**ARTICLE XI: PROVISIONS FOR CONTESTED CLAIMS AND INTERESTS** ............. **44**

**11.1.** **Objections to Claims** ....................................................................................... 44

**11.2.** **No Distributions Pending Allowances** .......................................................... 44

**11.3.** **Withholding and Distribution in Respect of Contested Claims** ................. 44

**11.4.** **Distribution in Respect of Contested Claims** ............................................... 44

**ARTICLE XII: EFFECT OF PLAN ON CLAIMS AND INTERESTS** ............................ **44**

**12.1.** **Revesting of Assets** .......................................................................................... 44

**12.2.** **Discharge** ......................................................................................................... 45

**12.3.** **Final Decree** ..................................................................................................... 45

**12.4.** **Injunction** ........................................................................................................ 45

**12.5.** **Exculpation** ...................................................................................................... 46

**12.6.** **Savings Clause** ................................................................................................. 47

**12.7.** **No Waiver of Causes of Action or Right to Set Off** ..................................... 47

**ARTICLE XII: EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................... **47**

**13.1.** **Leases and Executory Contracts** ................................................................... 47

**ARTICLE XIV: EFFECTIVENESS OF THE PLAN** ....................................................... **48**

**14.1.** **Conditions Precedent – Entry of Confirmation Order** ............................... 48

**14.2.** **Waiver of Deadlines or Other Conditions** .................................................... 48

**14.3.** **Default Remedies** ............................................................................................. 48

**ARTICLE XV: ADMINISTRATIVE PROVISIONS** ....................................................... **48**

**15.1.** **Retention of Jurisdiction** ................................................................................ 48

**ARTICLE XVI: MISCELLANEOUS** ................................................................................ **49**

**16.1.** **Special Tax Provisions** .................................................................................... 49

**16.2.** **Existing Organizational Documents** .............................................................. 49

**16.3.** **Headings** ........................................................................................................... 49

**16.4.** **Binding Effect** .................................................................................................. 50

**16.5.** **Modifications of Plan and Related Documents** ............................................. 50

**16.6.** **Filing or Execution of Additional Documents** ........................................................ 50

**16.7.** **Substantial Consummation** ........................................................................................ 50

**16.8.** **Notices** ........................................................................................................................ 50

**16.9.** **Inquiries** ...................................................................................................................... 51

**ARTICLE XVII: CONCLUSION** ................................................................................................ **51**

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

# ARTICLE I: INTRODUCTION

Debtor and Debtor-in-Possession, DemeRx, Inc. (the "Debtor"), through counsel and pursuant to §§ 1121, 1123 and 1125 of the United States Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure, proposes this First Amended Combined Chapter 11 Plan of Reorganization and Disclosure Statement ("Disclosure Statement," and together with the Plan of Reorganization, the "Plan") for the resolution of Claims against, and interests in, the Debtor. This Plan contains discussion, *inter alia*, of the history of the Debtor, financial information regarding the Debtor and its assets, the major events of the Chapter 11 Case, funding of the Plan, treatment of Claims against and interests in the Debtor, preservation of litigation claims, risk factors, liquidation analysis, tax implications, alternatives to the Plan, a summary and analysis of this Plan, and certain related matters.

This Plan provides for the exchange of debt created by the DIP Facility (along with the secured claim of Philip Sigel Trustee and the Class 6 claim of Shaya Yaki) for shares of New Common Stock; the use of funds created by the DIP Facility; the payment and/or exchange of certain costs of administration for shares of New Common Stock; the payment and/or exchange of post-Petition compensation due the Debtor's officers, directors, and employees for shares of New Common Stock; the formation of a Liquidating Trust to prosecute Litigation Claims on behalf of the Bankruptcy Estate; the payment to a Convenience Class; the payment to Allowed Non-Convenience Class Unsecured Creditors; and the striking of all pre-petition equity interests in the Debtor consistent with the absolute priority rule.

The Debtor is the proponent of this Plan within the meaning of § 1129 of the Bankruptcy Code. The Debtor filed its Case as a "small business debtor" as that term is defined in Section 101(51) of the Bankruptcy Code, however, on August 23, 2018, the Court entered an order terminating the Debtor's designation as a "small business debtor." Each holder of a Claim against the Debtor and/or interest in the Debtor is encouraged to read this Plan carefully and discuss it with your attorney, if you have one. If you do not have an attorney, you may wish to consult one. Creditors have the opportunity to vote to accept or reject the Plan. The Plan is summarized herein, and the purpose of the incorporated Disclosure Statement is to provide information deemed to be material, important and necessary to enable interested parties to arrive at a reasonably informed decision.

Subject to certain restrictions and requirements set forth in § 1127 of the Bankruptcy Code, Bankruptcy Rule 3018, and in the Plan, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date (as defined more fully below.)

Please address all inquiries concerning the Debtor, this Plan, and voting to Debtor's Attorneys: Geoffrey S. Aaronson, Esq., gaaronson@aspalaw.com, and Samuel J. Capuano, Esq., scapuano@aspalaw.com, Aaronson Schantz Beiley P.A., One Biscayne Tower, 2 South Biscayne Blvd., 34th Floor, Miami, Florida 33131, Tel. 786.594.3000, Fax 305.424.9336.

1

## ARTICLE II: DEFINITIONS

For purposes of this Plan, except as otherwise expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article II. Any term that is not defined herein, but is otherwise defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning described therein.

2.1.    *"**Administrative Conversion Credit**"* shall mean the credit applied to an Allowed Administrative Expense in exchange for conversion of such expense or a portion of such expense into shares of New Common Stock in the Debtor as may be agreed by an administrative creditor and the Debtor.

2.2.    *"**Administrative Expense**"* shall mean any right to payment constituting a cost or expense of administration of the Case that is Allowed under Sections 503(b) and/or 507(a)(2) of the Code, including, without limitation: (a) any actual and necessary costs and expenses of preserving the Debtor's Estates; (b) any actual and necessary costs and expenses of operating the Debtor's business; (c) any indebtedness or obligations incurred or assumed by the Debtor during the Case; (d) any compensation for professional services rendered and reimbursement of expenses incurred, to the extent Allowed by Final Order under section 330 or 503 of the Code; (e) all fees and charges assessed against the Estate under section 1930 of title 28 of the United States Code, and (f) all post-petition taxes.

2.3.    "**Alleged Default**" shall mean an alleged failure to make a payment required under the Plan. In the event of an Alleged Default, the Debtor shall have twenty days from the Debtor's receipt of written Notice of an Alleged Default to dispute the alleged failure to pay, or to cure such default. If the payment obligation is not met and Debtor does not cure such Alleged Default within the twenty day period, it shall be deemed a Default Event. If there is a dispute as to whether there is a Default Event, such dispute may be resolved by the Court on short notice.

2.4.    "**Alexander Capital**" shall mean Alexander Capital L.P., the Debtor's court approved registered broker/dealer.

2.5.    *"**Allowed**"* shall mean (i) with reference to any Claim, (a) any Claim against the Debtor, which has been listed by the Debtor in its Schedules (as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1007) as liquidated in amount and not disputed or contingent and for which no proof of Claim has been filed, (b) any Claim against the Debtor which is the subject of a duly filed and timely proof of claim that has not been objected to by the Debtor, (c) any Claim as to which the liability of the Debtor and the amount thereof are determined by a Final Order, or (c) any Claim against the Debtor allowed pursuant to this Plan, and any Claim or Administrative Expense expressly allowed under this Plan or by the Court. Unless otherwise specified in this Plan or ordered by the Court, "Allowed Claim" or "Allowed Administrative Expense" shall not include interest on such Claim or Administrative Expense from and after the Petition Date.

2.6.    *"**ASBPA**"* shall mean the Debtor's attorneys, Aaronson Schantz Beiley P.A.

2

2.7.   "**Available Funds**" shall mean all funds remaining in the DIP Account as of the Effective Date (1) after payment of administrative fees and expenses awarded by the Court (less any Administrative Conversion Credit to same as agreed by such administrative creditors and the Debtor) and (2) after subtracting the New Drug Development Reserve.

2.8.   "*__Ballot__*" shall mean the form or forms distributed to each holder of a Claim or an Impaired Claim or Interest on which the holder indicates acceptance or rejection of the Plan or any election for treatment of such Claim or Interest under the Plan.

2.9.   "*__Ballot Date__*" shall mean the date set by the Court by which all Ballots must be received.

2.10.   "*__Bankruptcy Code__*" or "**Code**" shall mean Title 11 of the United States Code, as in effect from time to time, as applicable to this Chapter 11 Case.

2.11.   "*__Bankruptcy Court__*" or "**Court**" shall mean the United States Bankruptcy Court for the Southern District of Florida (Miami Division) or any other Court that exercises jurisdiction over this Chapter 11 Case.

2.12.   "**Bankruptcy Estate**" means the estate created pursuant to Section 541 of the Bankruptcy Code by the commencement of the Chapter 11 Case.

2.13.   "*__Bankruptcy Rules__*" shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time applicable to the Chapter 11 Case, including the Local Rules of the Court.

2.14.   "**Beneficiary**" shall mean the holder of Beneficial Shares in the Liquidating Trust.

2.15.   "**Beneficial Shares**" shall mean the shares of beneficial interests in the Liquidating Trust with a nominal value of $1.00 per share.

2.16.   "**BPB**" shall mean Berkowitz Pollack Brant advisors and accountants.

2.17.   "**Budget**" shall mean the Debtor's going-forward, post-Confirmation budget attached hereto as Exhibit "A."

2.18.   "*__Business Day__*" shall mean any day except a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a) and the Court's Local Rules.

2.19.   "**Carve-Out Expenses**" shall mean, in connection with the DIP Facility: (a) all allowed and unpaid professional fees and expenses incurred by the Debtor; (b) the payment of all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6); and (c) all unpaid fees payable to the Clerk of the Bankruptcy Court.

2.20.   "*__Case__*" or "*__Chapter 11 Case__*" shall mean the Chapter 11 case of DemeRx, Inc. in the Bankruptcy Court.

3

**2.21.**  *"**Claim**"* shall have the meaning ascribed in Section 101(5) of the Code, including, without limitation, any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, uncontested, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmeasured, contested, uncontested, secured or unsecured.

**2.22.**  *"**Claims Bar Date**"* shall mean: (a) with respect to any non-governmental claims, August 13, 2018, which was the general deadline set by the Court for filing any proofs of claim; and (b) with respect to any governmental claims, October 9, 2018, which was the deadline set by the Court for government entities to file any proofs of claim. The Claims Bar Date may be amended only pursuant to Order of the Court.

**2.23.**  *"**Claims Objection Date**"* shall mean, absent a Court Order setting forth otherwise, 45 days after Confirmation Date, which shall be the last day by which the Debtor, the Insolvency Administrator, the Liquidating Trustee or any other interested party may file an Objection to any Claim, whether such Claim derives from the Debtor's Schedules or from a filed Proof of Claim.

**2.24.**  *"**Class**"* shall mean a group of Claims or Interests with the same respective rights and interests, as classified under the Plan.

**2.25.**  "**CMM**" shall mean the law firm Cimo Mazer Mark PLLC, the Debtor's special litigation counsel.

**2.26.**  *"**Collateral**"* shall mean the Debtor's IP, all rights associated with the IND, now or hereafter acquired, and all inventory, equipment, accounts, general intangibles, fixtures, money, instruments, securities, documents, chattel paper, deposits, credits, claims, and other real and personal property owned by the Debtor, together with the proceeds, products, offspring, rents, or profits thereof, as the case may be, in connection with the Debtor's pledge of some or all of these items to a creditor pursuant to a secured transaction.

**2.27.**  "**Confirmation**" shall mean the entry of a Confirmation Order.

**2.28.**  *"**Confirmation Date**"* means the date on which the Confirmation Order becomes a Final Order.

**2.29.**  *"**Confirmation Hearing**"* means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**2.30.**  *"**Confirmation Order**"* means the order or orders of the Bankruptcy Court confirming this Plan.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

**2.31.** *"**Contested Claim**"* shall mean a Claim (or portion thereof) which: (a) is scheduled, or a claim wherein a proof of claim was or is deemed filed under applicable law or Order of the Court; and (b) a timely and properly filed objection has not been: (i) withdrawn or resolved by stipulation or (ii) determined in whole or part by a Final Order.

**2.32.** *"**Convenience Class**"* shall mean the Class of Creditors with the Allowed Claim for each Creditor not more than $21,000.00. Creditors with Allowed Claims in excess of $21,000.00 may reduce their Allowed Claims to $21,000.00 and participate in the Convenience Class.

**2.33.** "**Conversion Privilege**" shall mean the conversion privilege provided to the DIP Lenders, in lieu of repayment of their DIP Loans, equal to ten shares of common stock for every $1.00 in DIP Loan funds that are funded.

**2.34.** *"**Court**"* shall mean the United States Bankruptcy Court for the Southern District of Florida (Miami Division) or any other Court that exercises jurisdiction over this Chapter 11 Case.

**2.35.** *"**Creditor**"* shall mean the holder of an Allowed Claim, whether or not such creditor was scheduled by the Debtor or filed a Proof of Claim.

**2.36.** *"**Creditors**"* shall mean all holders of Allowed Claims or assignees of Allowed Claims against the Debtor.

**2.37.** *"**Debtor**"* or "**Debtor in Possession**" shall mean DemeRx, Inc.

**2.38.** *"**Default Event**"* shall mean an uncured Alleged Default.

**2.39.** *"**DIP Account**"* shall mean the Debtor's operating accounts which are reported monthly to the Court and used by the Debtor as debtor-in-possession.

**2.40.** "**DIP Facility**" shall mean the secured Debtor-in-Possession financing authorized by the Court in the maximum amount of $2,000,000.

**2.41.** "**Debtor-in-Possession Lenders**" or "**DIP Lenders**" shall mean the lenders who participated in the Debtor's $2,000,000 DIP Facility, which includes certain pre-petition Rights Offering Subscribers and the New DIP Lenders.

**2.42.** "**DIP Loans**" shall mean the loans extended by the DIP Lenders to the Debtor in connection with its DIP Facility and memorialized by Convertible Promissory Notes and Debtor-in-Possession Loan Agreements.

**2.43.** *"**Disclosure Statement**"* means the incorporated Disclosure Statement in this Plan, including, without limitation, all exhibits and schedules hereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, Rule 3017 of the Bankruptcy Rules and Rule 3017-2 of the Local Rules.

5

**2.44.**    "**Distribution(s)**" shall mean the cash and any cash equivalents (in U.S. dollars) to be distributed pursuant to the Plan.

**2.45.**    "**Distribution Agent**" shall mean the Debtor who will be responsible for making Distributions according to this Plan, except for Distributions made by the Liquidating Trust which will be made by the Liquidating Trustee.

**2.46.**    "**Distribution Period**" shall mean the time period to accomplish all the payments set forth and as required by the Plan, but not to exceed five years.

**2.47.**    "**Dr. Mash**" shall mean Dr. Deborah C. Mash, the Chief Executive Officer, director, and founder of the Debtor.

**2.48.**    "**Drug Development**" shall mean acquiring, developing, and commercializing various intellectual property rights (patents, patent applications, know-how, etc.) relating to chemical compounds noribogaine and ibogaine and other similar or related compounds and proceeding to IND approval with the FDA.

**2.49.**    "**Effective Date**" shall mean the date the Confirmation Order becomes a Final Order.

**2.50.**    "**Existing Organizational Documents**" mean the articles of incorporation, and any other charter documents legally forming and/or organizing the Debtor, and all by-laws as may have been amended and/or restated up to, and in existence as of, the Petition Date. Except to the extent amended or restated by applicable New Organizational Documents, such Existing Organizational Documents will remain in full force and effect.

**2.51.**    "**FDA**" means the United States Food and Drug Administration.

**2.52.**    "**Fee Application**" shall mean an application under Section 330(a), 331, and/or 503 of the Bankruptcy Code for allowance of any Professional Claim.

**2.53.**    "**Final Order**" means an order or judgment of a court of competent jurisdiction, which has been entered on the docket maintained by the clerk of such court, and which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

2.54.    *"**Foley & Lardner**"* shall mean the law firm Foley & Lardner, LLP, the Debtor's former IP counsel.

2.55.    *"**General Unsecured Creditor**"* means a creditor asserting an allowed non-priority unsecured claim.

2.56.    *"**Holger Weis**"* shall mean Holger Weis, the Debtor's prior President, Chief Operating Officer, and Chief Financial Officer.

2.57.    "**Impairment**" of claims or interests means that a class of claims or interests is impaired under the Plan. A class is impaired ("**Impaired**") if the plan alters the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest. A class of claims or interests is unimpaired if the Plan, with respect to such class of claims or interests, leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest. In this Plan, a Class is not Impaired if it is paid in full on the Effective Date. If there is any chance that a Class will not be paid in full on the Effective Date, then the Class is deemed Impaired for voting purposes.

2.58.    "**IND**" shall mean the Debtor's Investigational New Drug Application to the United States Food and Drug Administration to approve ibogaine and noribogaine for sale and marketing.

2.59.    **"Insolvency Administrator"** shall mean Kolman Kenigsberg, the Court-appointed insolvency administrator of the Debtor.

2.60.    *"**Interested Parties**"* shall mean, collectively, the Debtor, the Creditors, and any others who have an interest in the Chapter 11 Case.

2.61.    "**IP**" shall mean all of the Debtor's intellectual property including, *inter alia*, all issued and pending foreign and domestic patents and patent applications.

2.62.    *"**Lien**"* has the meaning set forth in Section 101(37) of the Bankruptcy Code.

2.63.    *"**Liquidating Trust**"* shall mean the DemeRx, Inc. Liquidating Trust.

2.64.    *"**Liquidating Trust Agreement**"* shall mean the DemeRx, Inc. Liquidating Trust Agreement, the form of which is attached hereto as Exhibit "B."

2.65.    *"**Liquidating Trust Available Funds**"* shall mean the funds recovered by the Liquidating Trustee in respect of the Litigation Claims, net of costs of administration of the Liquidating Trust.

2.66.    *"**Liquidating Trustee**"* shall mean Geoffrey Aaronson, as DemeRx, Inc. Liquidating Trustee.

2.67.  "**Litigation Claims**" shall mean all claims, demands, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, rights to payment, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims (including, but not limited to, any Chapter 5 avoidance or recovery actions under the Bankruptcy Code or avoidance or recovery claims recognized under any applicable state law) whether known or unknown, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively in law, equity, or otherwise, that are or may be pending on the Effective Date or instituted after the Effective Date based on law or equity. Litigation Claims include, without limitation, those which are: (i) property of the Bankruptcy Estate under and pursuant to section 541 of the Bankruptcy Code; (ii) for subrogation and contribution; (iii) for turnover including pursuant to section 542 of the Bankruptcy Code; (iv) for avoidable transfers and preferences under and pursuant to sections 542 through 550 and 553 of the Bankruptcy Code or any applicable state law; (v) to determine the extent, validity and priority of liens and encumbrances; (vi) for surcharge under section 506(c) of the Bankruptcy Code; (vii) for subordination under section 510 of the Bankruptcy Code; (viii) related to federal or state securities laws; (ix) direct or derivative claims or causes of action of any type or kind; (x) against all former officers and directors of the Debtor, including, but not limited to Holger Weis; (xi) for breach of fiduciary duty or aiding and abetting breach of fiduciary duty against all former officers and directors of the Debtor, including, but not limited to Holger Weis; (xii) under and pursuant to any policies for insurance, including for bad faith, maintained by the Debtor, including, without limitation, any liability insurance policy; (xiii) for theft of corporate opportunity; (xiv) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; (xv) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; (xvi) which arise under or as a result of any section of the Bankruptcy Code; (xvii) for common law torts or aiding and abetting common law torts; (xviii) contract or quasi contract; (xix) derivative based; (xx) statutory claims; (xxi) arise out of or are related in any way to actions or claims pending as of the Effective Date; (xxii) for negligence including professional negligence; (xxiii) for unjust enrichment; (xxiv) to disallow or subordinate any proof of claim filed in the Chapter 11 Cases including but not limited to the claim of Foley & Lardner; (xxv) to recover an avoidable transfer from any mediate or subsequent transferee; or (xxvi) any claim held or assertable by either the Bankruptcy Estate or Liquidating Trustee. Litigation Claims shall not include those which arise after the Effective Date and which belong to the reorganized Debtor.

2.68.  "**Management**" shall mean those individuals set forth in the Table entitled "Management Conversion Credits" in paragraph 6.2 of this Plan.

2.69.  "***Management Conversion Credit**"* shall mean the exchange of all Allowed Administrative Expenses and all post-confirmation expenses due, or to become due, to Management in exchange for shares of New Common Stock in the Debtor as set forth in the Table entitled "Management Conversion Credits" in paragraph 6.2 of this Plan. It is anticipated that, other than the Management Conversion Credit, Management will not commence receiving salaries for at least six months after confirmation.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

2.70.  *"**New Common Stock**"* shall mean the new shares of common stock in the Debtor issued pursuant to this Plan pursuant to Section 1145(a) of the Bankruptcy Code.

2.71.  "**New Drug Development Reserve**" shall mean a reserve of no more than $200,000 for use by the Reorganized Debtor to fund certain future ongoing expenses associated with the continued prosecution of the IND.

2.72.  "**New DIP Lenders**" shall mean the participants in the Debtor's DIP Facility who were not pre-petition Rights Offering Subscribers.

2.73.  "**Non-Convenience Class Unsecured Creditors**" shall mean all General Unsecured Creditors that are not a member of the Convenience Class.

2.74.  *"**Petition Date**"* means April 9, 2018, the date on which the Debtor commenced this Case.

2.75.  *"**Plan**"* or "**Plan of Reorganization**"* means this Plan of Reorganization including all disclosures incorporated herein, including any supplement or amendment, together with any exhibits and schedules hereto, as the same may be amended or modified from time to time.

2.76.  *"**Plan Distributions**"* shall mean all the Distributions as set forth in this Plan.

2.77.  *"**Priority Claim**"* shall mean any Claim, if Allowed, entitled to priority pursuant to Section 507(a) of the Code, other than an Administrative Claim.

2.78.  *"**Professional Fees**"* shall mean all fees and costs approved by the Court under Section 330(a), 331, or 503 of the Code.

2.79.  *"**Pro Rata Share**"* shall mean with reference to any distribution on account of any Allowed Claim or Allowed Interest in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim or Allowed Interest bears to the aggregate amount of all Allowed Claims or Interests of the same Class.

2.80.  *"**Reorganized Debtor**"* shall mean the Debtor upon and after entry of the Confirmation Order.

2.81.  "**Rights Offering**" shall mean the Debtor's unsuccessful pre-petition rights offering.

2.82.  "**Rights Offering DIP Lenders**" shall mean the pre-petition Rights Offering Subscribers who participated in the Debtor's DIP Facility.

2.83.  "**Rights Offering Subscribers**" shall mean the approximately 50 subscribers that remitted funds to the Debtor prior to the Petition Date pursuant to the Rights Offering totaling $241,421.07.

9

2.84.  "**Rights Offering Subscriber Funds**" shall mean the $241,421.07 remitted to the Debtor prior to the Petition Date by the Rights Offering Subscribers.

2.85.  "*Schedules*" shall mean, inclusively, the Schedules of assets and liabilities and the Statement of Financial Affairs, as they may be amended from time to time, filed by the Debtor pursuant to Section 521 of the Code and the Bankruptcy Rules.

2.86.  "*Secured Claim*" means a Claim secured by a Lien on the Debtor's assets, but solely to the extent of the value of such creditor's interest in the Debtor's interest in said property. A secured claim is deemed secured to the extent defined by Sections 506(a) and (b) of the Code.

2.87.  "**Secured Creditor**" shall mean a creditor holding an allowed Secured Claim.

2.88.  "**Shaya Yaki**" shall mean Shaya Yaki Holdings, LLC.

2.89.  "**Sigel Lien**" shall mean the lien on the Debtor's assets in favor of Philip Sigel Trustee securing debt in the amount of $135,000.00.

2.90.  "**Substantial Consummation**" shall have the same meaning contemplated in Section 1101 of the Bankruptcy Code and will occur on the Effective Date.

2.91.  "**Trust Estate**" or "**Trust Assets**" shall mean the Litigation Claims, which shall be irrevocably assigned, transferred and conveyed to the Liquidating Trust as of the Confirmation Date of this Plan.

2.92.  "*United States Trustee Fees*" shall mean the fees payable to the United States Trustee's office pursuant to this bankruptcy filing.

2.93.  "*Unsecured Claim*" means any Claim that arose or accrued prior to the Petition Date that is not an Administrative Expense, Priority Tax Claim, Priority Non-Tax Claim, or Secured Claim, but including, without limitation, Claims arising from the rejection of an unexpired lease or executory contract pursuant to this Plan or other Final Order of the Bankruptcy Court.

## ARTICLE III: DISCLOSURES AND VOTING PROCEDURES

The Debtor, through counsel and pursuant to Sections 1121 and 1123 of the Bankruptcy Code and Rule 3016 of the Bankruptcy Rules, proposes its Plan of Reorganization and incorporated Disclosure Statement under Chapter 11 of the Bankruptcy Code. The Plan provides, *inter alia*, the means for distributing funds collected by the Debtor to its Creditors. Creditors have the opportunity to vote to accept or reject the Plan. The purpose of this incorporated Disclosure Statement is to provide information deemed to be material, important and appropriate to enable Creditors to arrive at a reasonably informed decision.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

**NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS PLAN OR THE SOLICITATION OF ITS ACCEPTANCE. ALL CREDITORS AND INTEREST HOLDERS ARE HEREBY ADVISED AND ENCOURAGED TO READ THIS PLAN IN ITS ENTIRETY, THE EXHIBITS HERETO AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT PRIOR TO OR CONCURRENT WITH THE FILING OF THIS PLAN. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE MADE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN ARE MATERIALLY ACCURATE; OR (B) THAT THIS PLAN CONTAINS ALL MATERIAL INFORMATION.**

**THE DISCLOSURES CONTAINED HEREIN ARE REQUIRED TO BE PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.**

**THE FINANCIAL INFORMATION CONTAINED IN THIS PLAN HAS BEEN PREPARED BY THE DEBTOR AND ITS COUNSEL AND HAS NOT BEEN SUBJECT TO INDEPENDENT REVIEW OR CERTIFIED AUDIT. THE DEBTOR HAS MADE EVERY EFFORT TO ENSURE THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE; HOWEVER, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THIS INFORMATION IS WITHOUT ANY INACCURACY.**

**THIS PLAN AND INCORPORATED DISCLOSURE STATEMENT MUST BE APPROVED BY THE COURT AS CONTAINING "ADEQUATE INFORMATION" FOR HOLDERS OF CLAIMS AND INTERESTS TO MAKE AN INFORMED DECISION IN ACCORDANCE WITH SECTION 1125(b) OF THE BANKRUPTCY CODE REGARDING WHETHER TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN. APPROVAL OF THE DISCLOSURES BY THE COURT DOES NOT INDICATE THE COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN.**

**YOU SHOULD READ THIS PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN.**

Section 1126 of the Bankruptcy Code entitles "impaired" classes of claims or interests to vote to accept or reject a proposed plan of reorganization. If a plan of reorganization contemplates the full payment of claims on the Effective Date, those classes of claims or interests would not be entitled to vote to accept or reject the plan as a matter of law.

Accordingly, the Debtor is circulating ballots to all classes of claims and interests because creditors and interest holders will not be paid in cash in full on the Effective Date under this Plan. A form ballot is attached hereto as Exhibit "C".

11

All votes to accept or reject the Plan garnered through the ballots distributed in connection with the Plan will be used to confirm the Plan pursuant to either Section 1129(a) or Section 1129(b) of the Bankruptcy Code. Ballots for acceptance or rejection of the Plan are being provided to members of such voting classes that may be defined as impaired.

After carefully reviewing this Plan, with exhibits, please indicate your vote by accepting or rejecting the Plan on the Ballot attached hereto or subsequently sent to you and return it in the envelope provided. In this regard, please see subsection 3.1. Voting Instructions, and read the package instructions carefully.

For a summary description of the treatment of each Class of Claims and interests and the estimated value of the Distribution to each Class of Claims and interests, *see* Article VIII.

Pursuant to the Bankruptcy Rules and Local Rule 3017-1, objections to the confirmation of the Plan, if any, shall be filed with the Court and served so as to actually be received by various parties not less than seven (7) business days before the confirmation hearing. The date of the Confirmation Hearing may be adjourned from time to time, without further notice.

## 3.1.    Voting

### 3.1.1.    Ballots

**In voting for or against the Plan, please use only the ballot sent to you with this Plan.**

### 3.1.2.    Returning Ballots

**IN ORDER TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED BY THE BALLOTING AGENT IDENTIFIED ON THE BALLOT ON OR BEFORE FEBRUARY ___, 2019, OR YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED LATER.**

## 3.2.    Objections to the Plan

Pursuant to Order of the Court, objections to confirmation of the Plan shall be filed at Clerk of the Court, United States Bankruptcy Court, 301 N. Miami Ave., Room 150, Miami, FL 33128, and served upon the Debtor by regular mail at 1951 NW 7th Avenue, Suite 300, Miami, Florida 33136; and upon the Debtor's counsel Geoffrey S. Aaronson, Esq. and Samuel J. Capuano, Esq. by email at gaaronson@aspalaw.com and scapuano@aspalaw.com and by regular U.S. mail at Aaronson Schantz Beiley P.A., One Biscayne Tower, 34th Floor, 2 South Biscayne Boulevard, Miami, Florida 33131, by **FEBRUARY ___, 2019**. All objections to the confirmation of the Plan must be served upon each of the persons set forth in Bankruptcy Rule 3020(b), including the U.S. Trustee.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

> **The Objection Deadline is: FEBRUARY ___, 2019 AT 5:00 P.M.**
>
> **(Eastern Standard Time)**

Section 1128 of the Bankruptcy Code requires a bankruptcy court to hold a hearing on the confirmation of a plan of reorganization under Chapter 11. Section 1128 of the Bankruptcy Code also provides that any party in interest may object to confirmation of the Plan.

> **The Confirmation Hearing will be held on FEBRUARY ___, 2019 AT ___:00 __.M.**
>
> **before the Honorable Robert A. Mark, United States Bankruptcy Judge in the**
>
> **United States Bankruptcy Court for the Southern District of Florida, Miami Division**
>
> **United States Bankruptcy Court, 301 N. Miami Ave., Courtroom 4, Miami, FL 33128**
>
> **(Eastern Standard Time)**

As a Creditor, your vote is important. In order for the Plan to be deemed accepted, of the ballots cast, Creditors that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims of a Class must accept the Plan in order that such Class be deemed to have accepted the Plan. However, even if a particular Class or Classes fails to accept the Plan, under the "cram-down" provisions of the Bankruptcy Code, assuming that the Plan is fair and equitable, the Debtor may still be afforded the right under the Bankruptcy Code to have the Plan confirmed over the objections of dissenting Creditors so long as the plan is consistent with other provisions and limitations set forth in the Bankruptcy Code.

**NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS PLAN. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE, OTHER THAN AS CONTAINED IN THIS PLAN SHOULD NOT BE RELIED UPON IN ARRIVING AT YOUR DECISION IN CASTING YOUR BALLOT(S) ON THE PLAN. SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE PLAN PROPONENT, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE UNITED STATES TRUSTEE FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.**

You are urged to carefully read the contents of this Plan before making your decision to accept or reject the Plan. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they presently exist.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

**THE INFORMATION CONTAINED IN THIS PLAN HAS BEEN SUBMITTED BY DEBTOR'S MANAGEMENT, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES. NO REPRESENTATIONS CONCERNING THE DEBTOR, OTHER THAN THOSE SET FORTH HEREIN, ARE AUTHORIZED BY THE DEBTOR.**

## ARTICLE IV: BACKGROUND OF THE DEBTOR'S BUSINESS

### 4.1.    Description of the Debtor

The Debtor is a pharmaceutical development company that was incorporated under the laws of the State of Florida on March 1, 2010, for the purpose of acquiring, developing, and commercializing various intellectual property rights (patents, patent applications, know-how, etc.) relating to chemical compounds called noribogaine and ibogaine and other similar or related compounds. The Debtor is an unregistered private company with approximately 189 pre-Petition shareholders. As a research and development company, the Debtor has no income, but it has extensive research and development expenses.

The Debtor is seeking to proceed with an investigational new drug application ("IND") to the United States Food & Drug Administration (the "FDA") in respect to the drugs noribogaine and ibogaine for the treatment of opioid dependence and other indications. The Debtor is ultimately seeking approval of these drugs from the FDA in order to market these drugs as a better alternative to methadone and buprenorphine treatment for opioid addiction.

Noribogaine is an active metabolite of ibogaine. Ibogaine is an indole alkaloid which may be effective for treating opioid and cocaine addiction in humans and is used currently in the addict self-help community for this purpose. Alkaloids are a group of naturally occurring chemical compounds that mostly contain basic nitrogen atoms. Indole, also called Benzopyrrole, is a heterocyclic organic compound occurring in some flower oils, such as jasmine and orange blossom, and other matters. It is believed that noribogaine has a lower potential for abuse than buprenorphine, methadone, and other opioids in clinical use for detoxification and treatment of drug addictions. Drug development of noribogaine and related molecules is based on the seminal work of the CEO, director, and founder, Dr. Deborah C. Mash, who is considered one of the world's leading experts on Ibogaine. Dr. Mash was a professor of neurology and molecular and cellular pharmacology for 32 years at the Leonard M. Miller School of Medicine, and founder and director of the Brain Endowment Bank at the University of Miami.

In the United States the Debtor holds six patents and nine patent applications relating to Noribogaine, two patents and eight patent applications relating to ibogaine, six patents and one patent application relating to synthetic noribogaine, noribogaine synthesis, and intermediates, and four patents relating to noribogaine derivatives. The Debtor has approximately 18 granted foreign patents, and approximately 90 pending foreign applications directed to noribogaine synthesis, intermediates, derivatives, and/or uses of noribogaine, ibogaine, or related compounds, in countries in Europe as well as in Canada, China, Japan, India, Brazil, and Australia (all aforesaid patents and patent applications, the "IP"). Additionally, the Debtor has commenced the drug approval process with an IND to the FDA.

14

**4.2.    Corporate History of the Debtor and Current Officers and Directors**

Deborah Mash, Steve Gorlin, and Charles Koob founded the Debtor in 2010, and thereafter the Debtor acquired the IP then held by Dr. Mash. The founding Board of Directors consisted of eight (8) members: Steve Gorlin; Charles E. Koob; Deborah C. Mash, Ph.D.; Franklyn G. Prendergast, M.D., Ph.D.; Maj. Gen. C.A. "Lou" Hennies; Parker H. "Pete" Petit; Bruce Hack; and Steven M. Paul, M.D. The executive officers at that time were Steve Gorlin (Chairman and CEO), Charles E. Koob (Chairman of the Executive Committee and Secretary), Dr. Mash (Vice President – Research and Development and Chief Scientific Officer), Stefan Schwabe MD (COO), John C. Thomas, Jr. (CFO, Treasurer, and Assistant Secretary), and Jeffrey L. Raney, Esq. (Executive Vice President – Administration). Dr. Rudolf Kwan was hired shortly thereafter to serve as President. Dr. Douglas Kramer joined the company as its VP of Regulatory and Clinical Affairs.

In 2013, Lawrence Friedhoff MD was recruited to the Debtor as CEO & President. Other officers at that time included Dr. Mash (Vice President – Research and Development and Chief Scientific Officer), Holger Weis (Chief Operating Officer, Chief Financial Officer, and Treasurer), and Jeffrey L. Raney, Esq. (Executive Vice President – Administration). Holger Weis replaced Stefan Schwabe as COO in late 2012.

In June 2013, due to disagreements with Dr. Friedhoff involving clinical trial designs and plans to conduct a pivotal study in New Zealand instead of the United States, Dr. Mash resigned from the Debtor's Board of Directors. Thereafter, Dr. Friedhoff resigned in 2014, and the then Board of Directors promoted Holger Weis to President, Chief Operating Officer, and Chief Financial Officer.

Holger Weis took over the direction of the Clinical Development program after the departure of Larry Friedhoff in 2014. Mr. Weis was responsible for closing out the New Zealand ZPS-513 study. The ZPS-513 and DMX-100 (Canada) trials were never finalized, and there was no submission to the FDA to address the Clinical Hold that had been issued in response to the IND application submitted in 2014. The Canada DMX-100 study was insufficient to address the FDA issues because there were too few study subjects. Apparently, all clinical trial activity ceased in 2016 due to a lack of funds.

Mr. Weis also apparently sponsored a preclinical study (6-OHDA Rat Study) in 2016 for potential Parkinson's disease applications and thereafter initiated a primate study. Mr. Weis also filed new intellectual property pertaining to Parkinson's and other disorders.

On July 20, 2017, the holders of a majority of the issued and outstanding shares of the capital stock of the Debtor executed, via proxies, written consents to remove Mr. Weis as President, Chief Operating Officer, and Chief Financial Officer, and also to remove the then current members of the Board of Directors, and to replace the Board with Dr. Mash, Ambassador Hans Hertell Esq., Christopher Hassan, Heather Callendar-Potters, and Richard Serbin, Esq., with Mr. Serbin to serve as the Executive Chairman of the Board. On July 24, 2017, Mr. Weis resigned as President, Chief Operating Officer, and Chief Financial Officer, and from the Board.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

Prior to the Petition Date, Mr. Weis commenced an arbitration proceeding with the American Arbitration Association against the Debtor styled *Holger Weis v. DemeRx, Inc.*, Case No. 01-17-0006-8886 relating to a compensation dispute. The Debtor believes it possesses defenses to, and counterclaims against Mr. Weis.

Thereafter, Dr. Mash recruited and signed an employment agreement with Dr. Robert Reder, the Debtor's current Vice President for Clinical Research and Development. Dr. Reder is an expert in opioid drugs, having worked at both Purdue Pharma and Endo Pharmaceuticals, and he has substantial experience with the FDA. In September of 2017, Michael Karukin Ph.D. joined the company as its Chief Operating Officer. Dr. Karukin worked for many years at Ivax, and then transitioned to lead the REMS program (Risk Evaluation and Mitigation Strategies) at Teva Pharmaceuticals USA. In 2018, John Thomas returned to the Debtor to serve as its Chief Financial Officer.

### 4.3.    The Debtor's Pre-Petition Shareholders

Pursuant to the Debtor's Articles of Incorporation, as amended, the Debtor was authorized to issue 50,000,000 shares of capital stock, of which 35,000,000 shares were designated as Common Stock and 15,000,000 shares were designated as Preferred Stock. Prior to the Petition Date, the Debtor issued 6,803,763 shares of Common Stock, 7,000,000 shares of Series A Preferred Stock to an initial round of investors, and 3,837,720 shares of Series B Preferred Stock to a second round of investors, to a total of approximately 189 shareholders.

### 4.4.    The Debtor's Pre-Petition Debt

The Debtor's pre-petition debts are comprised basically of: (1) the $135,000 secured obligation to Philip Sigel, Trustee; (2) the unsecured claim of the former President, Holger Weis, which claim was assigned to Shaya Yaki and was disputed and the subject of an Objection by the Debtor. The Shaya Yaki Claim was thereafter settled wherein it was agreed, *inter alia*, that Shaya Yaki would have an Allowed General Unsecured Claim in the amount of $150,000, while the Debtor retained all rights against Weis (discussed *infra*); (3) the Debtor's former IP counsel Foley & Lardner's disputed unsecured legal fees claim which claim was also settled such that Foley would have an Allowed General Unsecured Claim in the amount of $762,000; however, its claim would be deemed satisfied, subject to certain terms and conditions, upon payment of $400,000; (4) certain other undisputed unsecured legal fees owed (not to ASBPA) totaling approximately $149,000; (5) certain unpaid unsecured consulting fees, research and development costs, and other third-party debts totaling approximately $311,000; and (6) certain unsecured loans to the company in the amount of approximately $120,000 from Dr. Mash and Steve Gorlin. No taxes were due and owing on the Petition Date. All of these Allowed Claims are treated in the Plan.

### 4.5.    The Pre-Petition Rights Offering

In order to fund the costs of continuing to protect the Debtor's IP, and in order to continue to proceed with the IND, on November 17, 2017, the Debtor entered into a Rights Offering which initially offered to existing shareholders up to 6,000,000 shares, but not less than 4,000,000 shares, of Common Stock at $.25 a share; thereafter, on January 26, 2018, the Debtor supplemented its

16

initial offering by removing the requirement for a minimum sale of 4,000,000 shares and further eliminating the requirement that subscribers be limited to existing Shareholders (collectively, the "Rights Offering").

Pursuant to the Rights Offering, approximately 50 subscribers (each a "Rights Offering Subscriber" and collectively the "Rights Offering Subscribers") remitted funds to the Debtor totaling $241,421.07 (the "Rights Offering Subscriber Funds"). The funds have been held in escrow by Chapter 11 counsel for the Debtor at Aaronson Schantz Beiley, P.A. ("ASBPA"), pursuant to an Escrow Agreement. The Subscriber Funds in escrow from the Rights Offering were insufficient to fund the Debtor's operations for the time period necessary and to achieve FDA IND approval. Accordingly, the Debtor sought Court approval for the DIP Facility, as set forth, *infra*.

**4.6.    Significant Chapter 11 Events**

On April 9, 2018 (the "Petition Date") the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code [ECF 1].

On August 20, 2018, at a time when the Debtor was designated a "small business debtor" as that term is defined in Section 101(51) of the Bankruptcy Code, the Debtor filed its initial Combined Plan of Reorganization and Disclosure Statement [ECF 73] (the "Initial Small Business Plan").

On August 23, 2018, the Court entered an order terminating the Debtor's designation as a "small business debtor" pursuant to 11 U.S.C. § 101(51D). *See* ECF 77.

On September 14, 2018, the Debtor filed a subsequent Combined Plan of Reorganization and Disclosure Statement [ECF 98] (the "Initial Plan").

**4.6.1.  DIP Facility**

In order for the Debtor to continue operations, meet working capital requirements, protect its IP, secure assets including the supplies of drug products, prosecute the IND, formulate a viable Plan of Reorganization in the Chapter 11 Case, and to establish an initial Effective Date payment under this Plan, the Debtor required funds in addition to the Rights Offering Subscriber Funds. Accordingly, the Debtor sought Court approval of a secured Debtor-in-Possession financing facility ("DIP Facility") and on May 25, 2018, the Court entered the *Final Order Authorizing Secured Post-Petition Financing Pursuant to Convertible Promissory Note and Loan Agreement, as Amended, and 11 U.S.C. § 364; and Approving Escrow Agreement and Form of Direction Letter* [ECF 50] approving the DIP Facility, including related loan documents, in the maximum amount of $2,000,000.00.

Thereafter, on June 15, 2018, the Court entered the *Order Authorizing Employment of and Compensation to Alexander Capital L.P. Nunc Pro Tunc* [ECF 60] authorizing the Debtor to employ and pay registered broker/dealer Alexander Capital in connection with raising funds for the Debtor's DIP Facility. The Court approved an 8% commission to Alexander Capital with regard to the funds it raised. By the end of June 2018, the Debtor, with the assistance of Alexander

17

Capital, had raised the $2,000,000.00 from all but three of the Rights Offering Subscribers (the "Rights Offering DIP Lenders") as well as several new lenders ("New DIP Lenders," and collectively with the Rights Offering DIP Lenders, the "DIP Lenders").

The terms of the approved DIP Facility are as follows: the DIP Lenders shall forego repayment of their DIP Loans and receive, pursuant to this Plan, the higher of: (a) shares of common stock in the Debtor at the rate of ten shares of common stock for every $1.00 in DIP Loan funds that are funded, or (b) the conversion ratio provided to lenders in subsequent DIP financing and/or exit financing (the "Conversion Privilege"). In lieu of the Conversion Privilege, DIP Lenders shall have the option to be repaid their DIP Loans in full in cash over a period not to exceed two (2) years from the date of confirmation of the Debtor's Plan, so long as a majority of the DIP Lenders in both dollar amount and number exercise such repayment option. In such case, only DIP Lenders that have exercised such repayment option shall be repaid their DIP Loans in cash and the remainder of DIP Lenders shall receive stock pursuant to the Conversion Privilege. DIP Lenders were required to exercise such repayment option no later than seven (7) days prior to the hearing on the Debtor's Plan and Disclosure Statement. None of the DIP Lenders have exercised a repayment option; all expect to receive stock under the Conversion Privilege.

In the event of a default, set forth in the DIP Loan documents, the DIP Lenders would have a liquidation preference where they would be paid first, from the Collateral (the IP, all inventory, and all rights associated with the IND, now or hereafter acquired, subject only to an asserted first lien securing a $135,000 obligation to Philip Sigel Trustee), and Carve-Out Expenses (for all allowed and unpaid professional fees and expenses incurred by the Debtor; payment of all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and all unpaid fees payable to the Clerk of the Bankruptcy Court); and second, as an administrative priority claim subject to the same Carve-Out Expenses.

To secure all obligations under the DIP Facility, the DIP Lenders were granted, pursuant to Section 364(c) of the Bankruptcy Code, valid, perfected, and enforceable liens on all of the Debtor's assets, provided, however, that the Collateral did not include avoidance actions under Chapter 5 of the Bankruptcy Code, claims, if any, for director and officer liability and rights to any insurance policies covering same, and the proceeds of the foregoing. The security interest on Debtor's Collateral granted to DIP Lenders is subject only to the lien in favor of Philip Sigel Trustee securing debt in the amount of $135,000.00 (the "Sigel Lien") and Carve Out Expenses. Carve-Out Expenses are: (a) all allowed and unpaid professional fees and expenses incurred by the Debtor; (b) the payment of all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6); and (c) all unpaid fees payable to the Clerk of the Bankruptcy Court. Any DIP Lender seeking to foreclose or otherwise enforce rights upon or against the Collateral must first seek stay relief in this Court.

All post-petition debt incurred by the Debtor under the DIP Facility also constitutes allowed administrative expenses of the Debtor in the Chapter 11 Case. Such administrative expense has priority status, subject only to the Sigel Lien and the Carve-Out Expenses and are at all times be senior to the rights of any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code. Each DIP Lender's lien on the Collateral is *pari passu* with each other DIP Lender's lien on the Collateral.

18

Upon obtaining approval of its IND to be submitted to the FDA, the Debtor intends to move forward with another capital raise. This Plan provides for the payment in full of the Allowed Claims of General Unsecured Creditors from certain funds from the DIP Facility, from the Litigation Trust, and from such subsequent capital raise if necessary.

### 4.6.2. Retention of Counsel and Other Chapter 11 Matters

The continued prosecution and maintenance of the Debtor's IP, both foreign and domestic, is critical to the Debtor's viability. Accordingly, the Debtor sought entry of and on April 24, 2018, the Court entered: (1) the *Order Authorizing Employment of and Compensation to Intellectual Property Attorneys Nunc Pro Tunc* [ECF 28] authorizing the retention of Michael J. Keller, Esq. and the law firm of Halloran Farkas & Kittila, LLP, to handle all IP matters for the Debtor; and (2) the *Order Authorizing Debtor to Pay Patent Agents in Foreign Jurisdictions in the Ordinary Course* [ECF 29] authorizing the Debtor to make payments in the ordinary course to various patent agents in foreign jurisdictions. Thereafter, the Debtor sought entry of substitute IP counsel and on January 17, 2019, the Court entered its *Order Authorizing Employment of and Compensation to Intellectual Property Attorneys Nunc Pro Tunc* [ECF 181] authorizing the retention of Henry D. Coleman, Esq. and the law firm of CoSud Intellectual Property Solutions PC as substitute IP counsel.

Additionally, certain pre-petition vendors of the Debtor were critical to the Debtor's success in Chapter 11. Accordingly, the Debtor sought entry of and on April 20, 2018, the Court entered the *Order Authorizing Payment of Critical Vendors* [ECF 22] authorizing the Debtor to pay its Vice President for Clinical Research and Development and Senior Medical Officer, Dr. Robert F. Reder, who is critical to the Debtor's IND process with the FDA, as well as Vault Rooms, Inc., the Debtor's virtual data room, on account of their pre-petition Claims.

On April 20, 2018, the Court entered the *Final Order Approving Debtor's Application for Authorization to Employ Geoffrey Aaronson and Aaronson Schantz Beiley P.A., as Counsel for Debtor in Possession, Nunc Pro Tunc to Petition Date* [ECF 37] authorizing the retention of ASBPA as the Debtor's Chapter 11 counsel. Additionally, on August 30, 2018, the Court entered its: (1) *Order Approving Employment of Berkowitz Pollack Brant to Provide Forensic Services and to Pay Retainer* [ECF 85] ("Berkowitz Retention Order") authorizing the retention of Scott Bouchner and the firm of Berkowitz Pollack Brant to provide forensic services in connection with the investigation, analysis, and to the extent appropriate, the pursuit of litigation claims; and (2) *Order Approving Debtor's (i) Application for Approval of Employment of David C. Cimo, Marilee A. Mark, and the Law Firm of Cimo Mazer Mark PLLC as Special Litigation Counsel Nunc Pro Tunc to May 10, 2018 and (ii) Partially Modifying Employment Terms of Geoffrey S. Aaronson, Esq. and the Law Firm of Aaronson Schantz Beiley P.A. as Counsel to the Debtor* [ECF 86] ("Cimo Retention Order") authorizing the retention of David C. Cimo and Marilee A. Mark, and the law firm of Cimo Mazer Mark PLLC, in connection with due diligence, investigation, analysis, and to the extent appropriate, the pursuit of litigation claims, as well as authorizing the partial modification of the retention of ASBPA solely with respect to the pursuit of litigation claims.

19

On October 17, 2018, the Court entered the *Order Granting Debtor's Motion to Appoint Kolman Kenigsberg as Insolvency Administrator for the Limited Purpose of Protecting and Preserving Director and Officer Liability Claims in the Best Interests of the Bankruptcy Estate* [ECF 119]. The Insolvency Administrator was appointed for the limited purpose of protecting and preserving director and officer liability claims in the best interests of the bankruptcy estate including investigating and, to the extent appropriate, asserting claims against former officers and directors of the Debtor.

The majority of the Debtor's officers, directors, and employees have not been compensated during the pendency of the Chapter 11 proceeding. Accordingly, the Debtor intends to exchange such unpaid amounts into shares of New Common Stock in the Debtor pursuant to the Management Conversion Credit.

### 4.6.3.   Compromises with Foley & Lardner and Shaya Yaki

The Debtor's pre-petition IP counsel, Foley & Lardner, was listed on the Debtor's Schedule "F" [ECF 1] with a General Unsecured Claim in the amount of $712,391.21. The Debtor disputed Foley & Lardner's debt and the parties engaged in settlement discussions. On January 17, 2019, the Court entered the *Order Granting Debtor's Motion to Approve Settlement with Foley & Lardner LLP* [ECF 182]. The settlement between the Debtor and Foley & Lardner provides, *inter alia*, that Foley & Lardner shall have a General Unsecured Claim in the amount of $762,000, provided, however, that Foley & Lardner agrees to accept $400,000 in full satisfaction of its claim subject to certain conditions including, *inter alia*, that if the $400,000 is not paid within 14 months of the Effective Date of the Debtor's Plan, the claim amount shall increase by $10,000 per month for a maximum of 36 months. There are other salient terms to the settlement as set forth in the DemeRx/Foley Settlement Agreement. *See* ECF 161.

Holger Weis, the Debtor's former President, Chief Operating Officer, Chief Financial Officer and a director, filed Proof of Claim #2 in this Case in the amount of $621,384.81 relating to alleged unpaid compensation. On August 23, 2018, Shaya Yaki filed a *Transfer of Claim Other Than for Security* [ECF 79] ("Transfer of Claim") indicating that Weis had transferred his entire claim to Shaya Yaki unconditionally and irrevocably. On November 16, 2018, Shaya Yaki filed an Amended Proof of Claim #2 in the amount of $1,800,000.00.

The Debtor and Shaya Yaki engaged in several months of discovery and litigation relating to Shaya Yaki's claim, the Debtor's Plan and Disclosure Statement, and related matters, until, based upon the Transfer of Claim and based upon other representations to the Court, and representations to the Debtor, all to the effect that the Transfer of Claim was unconditional and irrevocable, on or about November 19, 2018, at a settlement meeting, the Debtor entered into a settlement agreement with Shaya Yaki that was memorialized in a settlement dated December 5, 2018 and signed by representatives of the Debtor and Shaya Yaki (the "November 19, 2018 Settlement"). An integral part of the November 19, 2018 Settlement provided in paragraph 6 therein:

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

Shaya agrees and affirms that, for a period of five years after Court approval of this settlement: (a) it shall not include Holger Weis in any discussions regarding this settlement; (b) it will not include Holger Weis in any benefits under this settlement and that Holger Weis will not benefit from the treatment accorded Shaya under Classes 4 and 6 under the Plan; (c) it shall not grant or assign to Holger Weis any stock or any stock interest granted to Shaya under this settlement; (d) it will not consult with, or communicate with, Holger Weis in connection with any consulting or advisory services that will be provided by Shaya Yaki to the Debtor or to the Debtor's Board of Directors, on a going forward basis; and (e) Holger Weis does not have any ownership interest, directly or indirectly, or control or influence over Shaya or any subsidiary, affiliate, or member of Shaya, and Shaya will prevent Holger Weis from acquiring such ownership interest or control hereafter.

On January 10, 2019, the day before hearing upon the November 19, 2018 Settlement, Holger Weis disclosed that on August 21, 2018, he had actually assigned his claim to Shaya Yaki pursuant to (a) an "Assignment of Claim" document and (b) a "Non-Binding Term Sheet," (the "Assignment Documents") both of which were attached to Holger Weis' *Limited Objection and Reservation of Rights to Debtor's Motion (1) To Approve Settlement with Creditor Shaya Yaki Holdings, LLC; (2) To Schedule Confirmation Hearing; And (3) To Set Status Conference* [ECF 172]. The Assignment Documents were inconsistent with the Transfer of Claim and representations made to the Debtor and provided, *inter alia*, for Holger Weis to own a portion of Shaya Yaki, for Weis to be a manager of Shaya Yaki, for Weis to receive the first $620,000 of any distribution to Shaya Yaki, and for Weis to consent to any settlement of the Shaya Yaki claim with the Debtor.

Thereafter, based upon the receipt and review of the Assignment Documents, at hearing on January 11, 2019, the Debtor withdrew its request for the Court to consider the November 19, 2018 Settlement, and the Debtor and Shaya Yaki engaged in further settlement discussions and entered into a new settlement (the "New Settlement"). The New Settlement, as amended, was approved at a hearing on January 23, 2019. The terms of the New Settlement include, *inter alia*: (1) the November 19, 2018 Settlement is void; (2) Shaya Yaki will have a Class 4 Allowed Undisputed Pre-Petition Unsecured Creditor Claim (Non-Convenience Class) in the amount of $150,000.00 (as compared to $250,000.00 in the November 19, 2018 Settlement); (3) Shaya Yaki will have an Allowed Class 6 Claim in the amount of $100,000.00 (as compared to $150,000.00 in the November 19, 2018 Settlement) which shall, on the Effective Date, be converted to New Common Stock at the same ratio as provided to the DIP Lenders under their Conversion Privilege as set forth in this Plan; (4) the settlement of Shaya Yaki's claim, and the payment and satisfaction thereof, is and shall be without prejudice to any of the Debtor's claims against Holger Weis; (5) various affirmations from Shaya Yaki relating to Weis including his lack of involvement in Shaya Yaki; and (6) a condition that Shaya Yaki and Weis have agreed that the Non-Binding Term Sheet is terminated and that any further obligations under the Assignment of Claim are terminated. There are other salient terms to the settlement as set forth in the *Amended Stipulation of Settlement Between Debtor and Shaya Yaki Holdings, LLC*. *See* ECF 190.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

## ARTICLE V: SUMMARY OF BANKRUPTCY AND CHAPTER 11 PROCEDURE

**5.1.    Property of the Estate**

The commencement of a Chapter 11 Case creates an estate comprising all the legal and equitable interests of the Debtor in property as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "Debtor-in-Possession" unless the Bankruptcy Court orders the appointment of a trustee or custodian. No trustee or custodian has been appointed in this case.

**5.2.    Automatic Stay**

Pursuant to Section 362 of the Bankruptcy Code, the filing of a Chapter 11 petition operates as an automatic stay applicable to all entities of various actions, including actions to collect pre-petition claims from the Debtor or otherwise interfere with its property or business, unless otherwise ordered or permitted by the Bankruptcy Court.

**5.3.    Plan of Reorganization**

This Plan sets forth the terms of the Debtor's financial reorganization. Section 1121 of the Bankruptcy Code provides that only a debtor may file a plan within a certain period after filing a bankruptcy petition, known as the exclusivity period. This Plan has been filed before the expiration of such exclusivity period.

**5.4.    Disclosure Statement**

An acceptance or rejection of a Plan may not be solicited after the commencement of a Chapter 11 case from the holder of a claim or equity interest unless, at the time of or before such solicitation, there is transmitted to such holder, the Plan and a written Disclosure Statement approved by the Court as "containing adequate information," after notice and a hearing on the contents therein. "Adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records that would enable a hypothetical, reasonable investor typical of holders of claims or interests of the relevant Class, to make an informed judgment about the Plan. This Plan contains both the Plan and Disclosure statement of the Debtor.

**5.5.    Acceptance and Confirmation of Plan**

As a condition of confirmation of the Plan, the Bankruptcy Code requires the Court determine that: (i) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (ii) the Debtor's disclosures concerning the Plan have been adequate and have included information concerning all payments made or promises by the Debtor in connection with the Plan and the Chapter 11 Case.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

Section 1129 of the Bankruptcy Code, which sets forth the requirements that must be satisfied in order for the Plan to be confirmed, lists the following requirements for the approval of any plan of reorganization, to the extent they are applicable in this particular case:

1.    A plan must comply with the applicable provisions of the Bankruptcy Code, including, *inter alia*, § 1123(a)(4), which provides that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Such anti-discrimination provision applies to contingent claims (such as guaranty claims) as well as all other claims and interests.

2.    The proponent of a plan must comply with the applicable provisions of the Bankruptcy Code.

3.    A plan must be proposed in good faith and not by any means forbidden by law.

4.    Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with such plan and incident to the case, must be approved by, or be subject to the approval of, the court as reasonable.

5.    (A)(i) The proponent of a plan must disclose the identity and affiliations of any individual proposed to serve, after confirmation of such plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under such plan; and,

    (ii) The appointment to, or continuance in, such officer or individual, must be consistent with the interests of creditors and equity security holders and with public policy; and

    (B) The proponent of a plan must disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation of each insider.

6.    Any governmental regulatory commission with jurisdiction, after confirmation of a plan, over the rates of the debtor must approve any rate change provided for in such plan, or such rate change is expressly conditioned on such approval. The Plan proposes no such change, nor does the Debtor have rates over which any governmental authority exercises jurisdiction.

7.    Each holder of a claim or interest in an impaired class of claims or interest must have accepted the plan or must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

8.      With respect to each class of claims or interest, such class must accept the plan or not be impaired under the plan (subject to the cramdown provision.)

9.      Except to the extent that the Holder of a particular claim has agreed to a different treatment of such claim, a plan must provide that:

(A) with respect to an administrative claim and certain claims in an involuntary case, on the effective date of the plan, the Holder of the claim will receive on account of such claim cash equal to the allowed amount of the claim;

(B) with respect to a class of priority wage, employee benefit, consumer deposit and certain other claims described in 11 U.S.C. § 507(a)(3)-(6), each holder of a claim of such class will receive:

(i)  if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim.

(C) with respect to a priority tax claim of a kind specified in 11 U.S.C. § 507(a)(8), the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the date of assessment of such claim of a value, as of the effective date of the plan equal to the allowed amount of such claim.

10.     If a class of claims is impaired under a plan, at least one class of claims that is impaired under such plan must have accepted the plan, determined without including any acceptance of the plan by any insider.

11.     Confirmation of a plan must not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the plan, unless such liquidation or reorganization is proposed in the plan. This is the so-called "feasibility" requirement.

12.     All fees payable under 28 U.S.C. § 1930, as determined by the Court at the hearing on confirmation of the plan, must have been paid or the plan must provide for the payment of all such fees on the effective date of the plan.

13.     A plan must provide for the continuation after its effective date of payment of all retiree benefits, as that term is defined in 11 U.S.C. § 1114, at the level established pursuant to 11 U.S.C. § 1114(e)(1)(B) or (g), at any time prior to confirmation of such plan, for the duration of the period the debtor has obligated itself to provide such benefits. The Debtor has no such benefits.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

### 5.6.    Voting

#### 5.6.1.   Who May Vote or Object?

A Creditor or equity holder has a right to vote for or against the Plan only if that Creditor or equity holder has a Claim or equity interest that is both: (a) allowed (or allowed for voting purposes); and (b) impaired. Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met. Many parties in interest, however, are not entitled to vote to accept or reject the Plan. Section 1126(g) of the Code provides that a Class is deemed not to have accepted a plan if such Class will not receive or retain any property under the plan.

#### 5.6.2.   What Is an Allowed Claim or an Allowed Equity Interest?

Only the holder of an Allowed Claim or an Allowed equity interest has the right to vote on the Plan. Generally, a Claim or equity interest is allowed if either: (a) the Debtor has scheduled the Claim or equity interest on its Schedules, unless the Claim has been scheduled as disputed, contingent, or unliquidated; or (b) the Creditor has filed a Proof of Claim or Equity Interest, and no objection has been filed to such Proof of Claim or Equity Interest. When a Claim or equity interest is not allowed, the holder of the Claim or equity interest cannot vote unless, after notice and hearing, the Court either overrules the objection or allows the Claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Bankruptcy Rules.

In this case, the deadline for filing a proof of claim for non-governmental entities expires on August 13, 2018. The deadline for governmental agencies to file a proof of claim is October 9, 2018. The Claims Objection Date will be one (1) year after the Effective Date.

#### 5.6.3.   What Is an Impaired Claim or Impaired Equity Interest?

As noted above, the holder of an Allowed Claim or equity interest has the right to vote only if it is in a Class that is "impaired" under the Plan. As provided in § 1124 of the Bankruptcy Code, a Class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.

#### 5.6.4.   Who is NOT Entitled to Vote?

The holders of the following types of Claims and/or equity interests are not entitled to vote to accept or reject the Plan:

- Holders of any Claim or equity interest that has been disallowed by an order of the Court;

- Holders of any other Claim or equity interest that are not Allowed Claims or Allowed "equity interest" (as defined in the Plan), unless they have been "allowed" for voting purposes;

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

- Holders of any Claim or equity interest in unimpaired Classes;

- Holders of Claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code;

- Holders of any Claim or equity interest in Classes that do not receive or retain any value under the Plan; and,

- Administrative Creditors.

Even if you are not entitled to vote on the Plan, you have a right to object to the confirmation of the Plan and to the adequacy of the Disclosure Statement.

### 5.6.5.  Who Can Vote in More Than One Class?

Any Creditor whose Claim has been allowed in part as a Secured Claim and in part as an Unsecured Claim, or who otherwise holds Claims in multiple classes, is entitled to accept or reject the Plan in each capacity and should cast one ballot for each Claim.

### 5.6.6.  Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless: (1) all impaired Classes have voted to accept the Plan, or (2) at least one impaired class of Creditors has accepted the Plan and, the Plan does not discriminate unfairly and is fair and reasonable in accordance with Section 1129(b) of the Bankruptcy Code. The Court is obligated to consider certain criteria in respect to secured creditors, unsecured creditors, and equity interest holders when it makes a determination under Section 1129(b).

#### 5.6.6.1.  Votes Necessary for a Class to Accept the Plan?

A class of Claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the Allowed Claims in the class who vote, cast their votes to accept the Plan; and (2) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims in the class who vote, cast their votes to accept the Plan. A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the Allowed equity interests in the class, who vote, cast their votes to accept the Plan.

### 5.6.7.  Impairment

A class of Claims or equity interests is "impaired" unless (1) the Plan leaves unaltered the legal, equitable, or contractual rights attaching to the Claims or equity interest; or (2) the Plan cures a default, reinstates the maturity of the debt, and compensates for any reliance upon the default.

26

### 5.6.8. Confirmation Standards

#### 5.6.8.1. Generally

The Plan Proponent must meet all applicable requirements of Section 1129(a) of the Bankruptcy Code. These requirements include, among other things, that: (a) the Plan complies with applicable provisions of Title 11, United States Code and other applicable law; (b) the Plan is proposed in good faith; (c) at least one impaired Class of Claims accepts the Plan (without counting votes of insiders); (d) the Plan distributes to each Creditor and equity interest Holder at least as much as the creditor or equity holder would receive in a chapter 7 liquidation case, unless the Creditor or equity interest Holder votes to accept the Plan; and, (e) the Plan is feasible. These requirements are not the only requirements listed in Section 1129 of the Bankruptcy Code, and they are not the only requirements for Confirmation

#### 5.6.8.2. Cramdown

The Bankruptcy Court may also confirm the Plan even though fewer than all the classes of impaired claims and interests have accepted the Plan. If the Plan is to be confirmed despite the rejection of a class of impaired claims or interests, then the proponent of the Plan must show, among other things, that the Plan does not discriminate unfairly and that the Plan is fair and equitable with respect to each impaired class of claims or interest that has not accepted the Plan. In determining under Section 1129(b) whether the Plan does not discriminate unfairly and that the Plan is fair and equitable with respect to each impaired class of claims or interests, the Court is obligated to consider certain criteria in respect to secured creditors, unsecured creditors, and equity interest holders.

It is anticipated that the pre-petition shareholders will be subject to Section 1129(b)(2)(C) cramdown because they will not be retaining their stock interests under the Plan. The New Shareholders will replace the pre-petition shareholders because the New Shareholders funded the $2,000,000 DIP Convertible Loan Facility which allowed the Debtor to survive, maintain its IP, pursue its IND, and to reorganize under this case. All pre-petition shareholders were granted an opportunity to participate in the DIP facility. Many of the pre-petition shareholders did participate in the DIP facility.

#### 5.6.8.3. Liquidation Analysis

To confirm the Plan, the Court must find that all Creditors and equity interest Holders who do not accept the Plan will receive at least as much under the Plan as such Creditors and/or equity interest Holders would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

#### 5.6.8.4. Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by a liquidation, or the need for further financial reorganization of the Debtor (or any successor to the Debtor), unless such liquidation or reorganization is proposed in the Plan.

27

## **ARTICLE VI: OUTLINE OF THE PLAN**

**6.1.    Summary of Payments and Conversion Rights Under the Plan**

By way of summary, the Plan provides for the exchange of debt created by the $2,000,000 DIP Facility for New Common Stock in the Debtor at the rate of ten shares of common stock for every $1.00. The Plan also provides for the exchange of the secured claim of Philip Sigel Trustee in the amount of $135,000 and the Class 6 Claim of Shaya Yaki in the amount of $100,000 into shares of New Common Stock in the Debtor at the rate of ten shares of common stock for every $1.00. The exchange of the DIP Facility, the Philip Sigel Trustee claim and the Class 6 Shaya Yaki Claim for New Common Stock is pursuant to Section 1145(a) of the Bankruptcy Code. Accordingly, Section 5 of the Securities Act of 1933 and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security do not apply.

Summarily, the Plan also provides for the following:

- On the Effective Date, payment in full of all costs of administration and/or an Administrative Conversion Credit (where Debtor's counsel has agreed to exchange a portion of its fee award for New Common Stock);
- On the Effective Date, the exchange of certain unpaid post-Petition compensation due, and to become due, to the Debtor's officers, directors, and employees, for shares of New Common Stock pursuant to the Management Conversion Credit;
- On the Effective Date, payment to a Convenience Class of 50% of Allowed Claims;
- On the Effective Date, payment to the Non-Convenience Class Unsecured Creditors on account of their Allowed Claims from Available Funds, which consists of all funds remaining in the DIP Account as of the Effective Date after payment of administrative fees and expenses awarded by the Court (less any Administrative Conversion Credits) and subject to the New Drug Development Reserve;
- After the Effective Date, full payment to Non-Convenience Class Unsecured Creditors on account of their Allowed Claims from Liquidating Trust Available Funds and from the funding of a future capital raise by the Debtor (which capital raise will be subject to FDA approval of the Debtor's IND).
- On the Effective Date, the striking of all pre-Petition equity interests in the Debtor consistent with the absolute priority rule encompassed in Section 1129(b); and
- On the Effective Date, the formation of a Liquidating Trust to prosecute Litigation Claims on behalf of the Bankruptcy Estate.

All Creditors and equity interest holders should refer to Article VIII of the Plan for information regarding the precise treatment of their Claims.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

**6.2.    Allowed Administrative Expenses**

At confirmation, or as soon thereafter as is practicable, the Court will award attorney's fees and reimbursement of costs to ASBPA, counsel to Debtor (the "Fee Award"). Thereafter, funds maintained in the DIP Account shall be paid and delivered to ASBPA towards satisfaction of the Fee Award. For purposes of this Plan, it is estimated that the Fee Award will be between $400,000 to $500,000. ASBPA has already received a $85,000 retainer in this case.

ASBPA is agreeable to an Administrative Conversion Credit equal to $100,000 of its total Fee Award into shares of New Common Stock at the same ratio as the DIP Loan Conversion Privilege. Accordingly, ASBPA will receive ten shares of common stock for every $1.00 of Administrative Conversion Credit, or 1,000,000 shares of New Common Stock is satisfaction of $100,000 of fee award. The New Common Stock issued pursuant to the Plan is issued pursuant to Section 1145(a) of the Bankruptcy Code and accordingly Section 5 of the Securities Act of 1933 and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security do not apply. Therefore, it will receive its Fee Award in cash on the Effective Date (less $100,000 and less its $85,000 retainer received at the inception of the case), and 1,000,000 shares of New Common Stock.

At confirmation, all ordinary course ongoing business expenses will be current with the exception of the payment of certain post-Petition compensation due to the Debtor's officers, directors and employees. It is estimated that, following payment of Administrative Expenses, payment to the Convenience Class, and set aside of the New Drug Development Reserve, there will be approximately $110,000 in the DIP Account for distribution to Unsecured Creditors.

| Funds Available for Effective Date General Unsecured Creditor Distribution (All Figures Estimated) | | |
|---|---|---|
| Remaining Cash from DIP Facility at Confirmation | | 700,000.00 |
| Administrative Fees & Costs Award – ASBPA; Berkowitz; Kenigsberg; Coleman; US Trustee | (540,000.00) | |
| Less Estimated Administrative Conversion Credit | 100,000.00 | |
| Less Paid Retainer | 85,000.00 | |
| Net Administrative Fees & Costs | | (355,000.00) |
| New Drug Development Reserve | | (200,000.00) |
| Convenience Class | | (35,000.00) |
| **Available for Effective Date GUC Distribution** | | **110,000.00** |

As set forth below, the Debtor's officers, directors, and key employees have deferred compensation during the pendency of the Chapter 11 Case, and will defer compensation through approval of the IND application by the FDA. Accordingly, in satisfaction of deferred compensation, the Debtor will convert and exchange such unpaid post-Petition and post-confirmation compensation into shares of New Common Stock in the Debtor pursuant to the Management Conversion Credit at the rate of ten shares of common stock for every $1.00 in

29

deferred salary. The New Common Stock issued pursuant to the Plan is issued pursuant to Section 1145(a) of the Bankruptcy Code and accordingly Section 5 of the Securities Act of 1933 and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security do not apply. However, since the New Common Stock will be issued on the Effective Date, and the stock will be in exchange for (in part) post-confirmation services, the New Common Stock issued to Management will be subject to a Restricted Stock Agreement. The Restricted Stock Agreement will provide that New Common Stock issued to Management is subject to divestment for any time period in which the particular holder has failed to provide management and/or employment services to the Reorganized Debtor post-confirmation. The Management Conversion Credit will be applied as follows:

| Management Conversion Credits | | | |
|---|---|---|---|
| **Name** | **Position** | **Estimated Deferred Post-Petition Compensation** | **Shares of New Common Stock** |
| Deborah C. Mash | CEO and Director | $200,000 | 2,000,000 |
| John C. Thomas | CFO | $80,000 | 800,000 |
| Robert Reder | VP for Clinical R&D | $50,000 | 500,000 |
| Michael Karukin | COO | $47,500 | 475,000 |
| Richard Serbin | Executive Chairman of the Board of Directors | $12,500 | 125,000 |
| Hans Hertell | Director | $10,000 | 100,000 |
| Christopher Hassan | Director | $10,000 | 100,000 |
| Heather Callendar-Potters | Director | $10,000 | 100,000 |
| Robert Moriarty | Medicinal Chemistry Specialist | $5,000 | 50,000 |
| William Schinzer | CMC Regulatory Specialist | $5,000 | 50,000 |
| **Totals** | | **$430,000** | **4,300,000** |

It is anticipated that the aforementioned Management of the Debtor will continue to work for the Debtor post-confirmation. However, other than Dr. Robert Reder and Michael Karukin, who will receive substantially under-market and reduced compensation (their individual Management Conversion Credits comprising the difference), none of the Debtor's Management expects to receive compensation post-confirmation for a period of at least six (6) months.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

### 6.3.    New Common Stock in the Debtor

Under this Plan, the Debtor will be issuing 27,650,000 shares of New Common Stock and all pre-Petition shares of stock in the Debtor will be stricken. See below.

| Issuance of New Common Stock | | | |
|---|---|---|---|
| | | New Common Stock | % of New Common Stock |
| Administrative Conversion Credit | $100,000 | 1,000,000 | 3.62 |
| DIP Loan | $2,000,000 | 20,000,000 | 72.33 |
| Philip Sigel Trustee Loan | $135,000 | 1,350,000 | 4.88 |
| Management Conversion Credit | $430,000 | 4,300,000 | 15.55 |
| Shaya Yaki | $100,000 | 1,000,000 | 3.62 |
| Totals | | 27,650,000 | 100.00 |

### 6.4.    The Liquidating Trust

#### 6.4.1.    Establishment of the Liquidating Trust

On the Effective Date, the Liquidating Trustee (on behalf of the Debtor and its Beneficiaries), shall execute the Liquidating Trust Agreement and take all steps necessary to establish the Liquidating Trust. Following the execution of the Liquidating Trust Agreement, the Liquidating Trustee shall retain and have standing to pursue Litigation Claims on behalf of the Estate pursuant to Section 1123(b)(3)(B) of the Code. The Liquidating Trust, as successor to the interests of the Debtor, shall be subject only to the limitations, if any, set forth in this Article VI, and set forth in the Liquidating Trust Agreement.

In the event of an inconsistency, the provisions of this Plan shall control over the contents of the Liquidating Trust Agreement. Similarly, the provisions of the Confirmation Order shall control over the contents of this Plan.

#### 6.4.2.    Purpose of the Liquidating Trust

The Liquidating Trust is being established for the purpose of prosecuting any Litigation Claims held by the Debtors and distributing cash and other property held by the Liquidating Trust in accordance with this Plan and the Liquidating Trust Agreement. The Liquidating Trustee shall retain the right to obtain and otherwise demand the turnover of property, documents, information, and/or discovery pursuant to Federal Rule Bankruptcy Procedure 2004 and Sections 541, 542, and 543 of the Bankruptcy Code. Any compromise or settlement of any Litigation Claim shall be subject to the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

The Liquidating Trust shall not continue or engage in any trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Unless otherwise required by law, it is intended that all parties shall treat the Liquidating Trust as a liquidating trust for all federal income tax purposes.

In the event the Liquidating Trust has not been terminated but the Non-Convenience Class Unsecured Creditors have been paid in full, all outstanding Litigation Claims of the Liquidating Trust shall continue to be prosecuted and net proceeds therefrom shall be distributed to the Debtor for Drug Development.

### 6.4.3.   Liquidating Trust Management

Geoffrey Aaronson shall be the Liquidating Trustee with the power and authority set forth in the Liquidating Trust Agreement. Geoffrey Aaronson, or any successor trustee, shall maintain a bond equal to 150% of the cash held by the Liquidating Trustee for the benefit of the Liquidating Trust. The Liquidating Trustee shall, on behalf of the Liquidating Trust, be appointed and authorized to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 6.4.4.   Liquidating Trust Structure

As more fully set forth in the Liquidating Trust Agreement, the Liquidating Trustee shall oversee and direct the Liquidating Trust's operations and activities, including the retention of counsel, decisions to pursue or not pursue Litigation Claims belonging to the Liquidating Trust and settlement of any such Litigation Claims.

### 6.4.5.   Costs and Expenses of the Liquidating Trust.

The Liquidating Trustee shall pay out of the Trust Estate, on a monthly basis and without notice or application to the Bankruptcy Court, including, without limitation: (1) all reasonable costs, expenses and obligations incurred by the Liquidating Trustee in carrying out his duties under the Liquidating Trust Agreement or in any manner connected, incidental or related to the administration of the Liquidating Trust (excluding Professionals), as set forth in the Liquidating Trust Agreement; and (2) any taxes, charges, and assessments which may be owed by, or levied or assessed against, the Trust Estate or any property held in trust pursuant to the Liquidating Trust Agreement.

### 6.4.6.   Compensation of Professionals Retained by the Liquidating Trustee

Any fees and expenses of professionals retained by the Liquidating Trustee shall be payable from the Trust Assets, subject to approval of an application for allowance and payment of such fees and expenses by the Bankruptcy Court.

The Liquidating Trustee's general and litigation counsel shall be ASBPA and CMM. The Liquidating Trustee's forensic specialist shall be BPB. The terms of compensation for ASBPA,

CMM, and BPB shall be the same in all respects as those approved by the Bankruptcy Court in connection with Litigation Claims.

The Liquidating Trustee shall be authorized to seek approval from the Bankruptcy Court of the retention of any additional or substitute professionals at his discretion.

### 6.4.7.  Resignation and Removal of the Liquidating Trustee

The Liquidating Trustee may resign and be discharged from any future obligations and liabilities under the Liquidating Trust Agreement by giving written notice thereof to the Bankruptcy Court at least thirty (30) days prior to the effective date of such resignation. Such resignation shall become effective on the date specified in such notice. The Liquidating Trustee may be removed at any time upon a vote of the Beneficiaries holding a majority of the Beneficial Shares or by order of the Bankruptcy Court upon motion by any party in interest pursuant to the standard under applicable law for removal of a Chapter 7 trustee. Upon any such removal, the removed Liquidating Trustee shall be entitled to any reimbursement and indemnification set forth in the Liquidating Trust Agreement which remains due and owing to the Liquidating Trustee at the time of such removal. If, at any time, the Liquidating Trustee shall give notice of his intent to resign pursuant to the Liquidating Trust Agreement, or be removed or shall become incapable of acting, counsel to the Liquidating Trustee shall provide notice thereof to the Bankruptcy Court. The Beneficiaries (based on a majority vote of the holders of the Beneficial Shares), only with the approval of the Bankruptcy Court, shall designate a successor liquidating trustee for the Liquidating Trust.

Additionally, the United States Trustee may, but is not obligated, to seek removal of the Liquidating Trustee if the United States Trustee feels such removal is warranted. The United States Trustee shall not be responsible for monitoring the Liquidating Trustee, but shall have standing to be heard in all matters regarding the Liquidating Trust or brought by or against the Liquidating Trustee

### 6.4.8.  Continuation of Automatic Stay

In furtherance of the implementation of the Plan, and to the fullest extent permitted under Section 362(c) of the Bankruptcy Code, all injunctions or stays provided for in the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect and apply to all parties holding Claims against or interests in the Debtor, the Estate, the Debtor's assets, the Liquidating Trustee, the Liquidating Trust and the Trust Assets.

### 6.4.9.  Closing of the Chapter 11 Case

Notwithstanding the formation of the Liquidating Trust, this Chapter 11 Case shall be closed upon the substantial consummation of this Plan on the Effective Date. The Liquidating Trustee shall be authorized to reopen this Chapter 11 Case as necessary in the administration of his duties as Liquidating Trustee in order to, *inter alia*, seek approval of compromises under Bankruptcy Rule 9019, for the retention of professionals, for the filing of fee applications, and to finally close the case.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

## 6.5. Post-Confirmation Litigation Claims

### 6.5.1. Transfer and Enforcement of Causes of Action

Pursuant to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in this Plan or the Confirmation Order, all Litigation Claims are expressly preserved, reserved and retained by the Liquidating Trust and the Liquidating Trustee or other appropriate party in interest including any designee or successor of the Liquidating Trustee will have the exclusive right to enforce any and all Litigation Claims and rights of the Debtor that arose before or after the Petition Date (including, but not limited to, the rights and powers of a trustee and debtor-in-possession) against potential targets of the Litigation Claims. The right to bring all Litigation Claims against any targets is expressly and entirely preserved and retained. Any compromise by the Liquidating Trustee shall be subject to Bankruptcy Court approval pursuant to Rule 9019.

### 6.5.2. Objections to Claims

Subject to applicable law, and except as otherwise set forth herein, from and after the Effective Date, the Liquidating Trustee shall have the authority to litigate to judgment objections to Claims or interests pursuant to applicable procedures established by, or grounds set forth in, the Bankruptcy Code, the Bankruptcy Rules, the Liquidating Trust Agreement and this Plan, whether such objections have already been filed or not. Any compromise of any Claim objection shall be subject to Bankruptcy Court approval. The deadline within which objections to Claims or Interests may be filed shall be one (1) year from the Effective Date; provided, however, that such deadline may be extended from time to time upon application to and approval by the Bankruptcy Court.

## ARTICLE VII: ADMINISTRATIVE CLAIMS AND OPERATING EXPENSES

## 7.1. Administrative Claims

As provided in Section 1123(a)(1) of the Code, Administrative Claims against the Debtor will not be classified for purposes of voting or receiving distributions under the Plan. All such Claims will be treated separately as unclassified Claims and obligations on the terms set forth in this Article VII.

### 7.1.1. Ongoing Operating Costs of Business

All ordinary course operating costs and expenses of the Debtor outstanding on the Effective Date, including any actual and necessary costs and expenses of operating the Debtor's business, any business related indebtedness or obligation incurred or assumed by the Debtor during the Case, and all post-petition taxes, shall be paid in the ordinary course by the Debtor, with the exception of certain compensation due the Debtor's current officers, directors and employees, who will receive shares of New Common Stock in the Debtor pursuant to the Management Conversion Credit as detailed in Article VI.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

### 7.1.2. Professional Fees – ASBPA

The Debtor's attorneys, Aaronson Schantz Beiley P.A., were retained and approved by the Court *nunc pro tunc* as of the Petition Date. The ASBPA retention was partially modified to provide for a contingency fee relating to recovery from Litigation Claims. At this time, the Debtor does not know the exact amount of attorneys' fees and costs that ultimately will be sought by ASBPA, but it is estimated that its fees and costs, exclusive of Litigation Claims, will be in the range of $400,000 to $500,000. Prior to Confirmation Hearing, ASBPA will file an Application for Payment of Fees and Reimbursement of Expenses ("Fee Application") for review by the Court and Interested Parties, which will detail the services rendered and costs incurred. The Court will rule upon the Fee Application at the Confirmation Hearing based upon the reasonableness of the Application under prevailing case law. ASBPA fees and costs associated with Litigation Claims (along with fees and costs to co-counsel CMM) shall be derived from a percentage of recoveries, if any.

### 7.1.3. United States Trustee Fees

The Debtor may owe fees to the Office of the United States Trustee. Any such fees owed to the Office of the United States Trustee are determined by statute (28 U.S.C. § 1930).

### 7.1.4. Treatment of Administrative Claims

#### 7.1.4.1. Administrative and Management Conversion Credits

In satisfaction of Administrative Expenses, Administrative Expenses (as awarded by the Court) shall receive either: (a) payment in cash on the Effective Date or thereafter as agreed; or (b) a pro rata distribution of New Common Stock on the Effective Date as set forth in Article VI. ASBPA has agreed to accept an Administrative Conversion Credit in exchange for $100,000 of its awarded fees for services exclusive of services related to the Litigation Claims. Similarly, Management has agreed to accept a Management Conversion Credit in exchange for its unpaid post-petition and post-confirmation services.

#### 7.1.4.2. Professional Fees

Except to the extent that a holder of claims for Professional Fees agrees to a different treatment, claims for Professional Fees will be paid on the Effective Date cash equal to the allowed amount of such claims.

#### 7.1.4.3. United States Trustee

The Reorganized Debtor shall pay the United States Trustee the appropriate sum required for pre-confirmation periods pursuant to 28 U.S.C. Section 1930(a)(6) in a lump sum on the Effective Date, and simultaneously will provide to the United States Trustee an appropriate affidavit indicating the cash disbursements for the relevant period. The Reorganized Debtor shall further pay the United States Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursements of the Reorganized Debtor for post-confirmation periods

35

within the time period set forth in 28 U.S.C. § 1930(a)(6), until the earlier of the closing of this case (whether by an administrative closure of the Case or by the issuance of a Final Decree), or upon the entry of an Order by this Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code, and the party responsible for paying the post-confirmation United States Trustee fees shall provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

### 7.1.5.  Payment.

Upon the Effective Date, the Debtor will commence payments to ASBPA and the United States Trustee as set forth in this Plan and issue shares of New Common Stock pursuant to the Administrative Conversion Credit and Management Conversion Credit.

## ARTICLE VIII: CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 8.1.    Classification and Impairment of Claims

#### 8.1.1.  Delineation

The following sets forth the classification of claims and whether such claims may be impaired under the Plan.

| | Classifications | Impaired |
|---|---|---|
| Class 1 | Convenience Class | Yes |
| Class 2 | Not Applicable | N/A |
| Class 3 | Allowed Pre-Petition Secured Claim of Philip Sigel Trustee | Yes |
| Class 4 | Allowed Pre-Petition Unsecured Creditors (Non-Convenience Class) | Yes |
| Class 5 | Not Applicable | N/A |
| Class 6 | Allowed Claim of Shaya Yaki | Yes |
| Class 7 | Allowed Pre-Petition Shareholders | Yes |

### 8.2.    Treatment

The following sets forth the treatment for each of the Classes of Claims and interests.

| Classification | | Approximate Claim Amount | Treatment |
|---|---|---|---|
| Class 1 | Convenience Class | $72,577.30 | Class 1 will receive, on the Effective Date, a distribution *pro rata* among the members of Class 1, equal to 50% of their Allowed Claims. Creditors with Allowed |

36

|  |  |  | Claims in excess of $21,000.00 will be granted the right to reduce their Allowed Claims to $21,000.00 and participate in the Convenience Class. |
|---|---|---|---|
| Class 2 | Not Applicable | Not Applicable | Not Applicable |
| Class 3 | Allowed Pre-Petition Secured Claim of Philip Sigel Trustee | $135,000.00 | Class 3 will receive on the Effective Date a distribution of New Common Stock through the issuance of ten shares for every dollar lent to the Debtor. The New Common Stock issued pursuant to the Plan is issued pursuant to Section 1145(a) of the Bankruptcy Code and accordingly federal and state registration and licensing laws do not apply. |
| Class 4 | Allowed Undisputed Pre-Petition Unsecured Creditors (Non-Convenience Class) | $1,403,461.98 | Class 4 will receive distributions as follows: (1) On the Effective Date, a distribution *pro rata* to members of Available Funds; and thereafter (2) Distribution(s) of Liquidating Trust Available Funds *pro rata* among members, within 30 days after such funds become available to the Liquidating Trust. If Liquidating Trust Available Funds exceed the total Allowed Amount of Class 4 Creditors, the excess shall be used for Drug Development; and (3) Distributions from the funding of a future capital raise by the Debtor (which capital raise will be subject to FDA approval of the Debtor's IND).<br><br>Class 4 is comprised of eight General Unsecured Claims and includes, *inter alia*: (1) the |

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

| | | | Allowed Claim of Foley & Lardner LLP in the amount of $762,000 which, subject to certain terms and conditions, will be deemed satisfied upon payment of $400,000, and (2) one of the two Allowed Claims of Shaya Yaki in the amount of $150,000. The other Shaya Yaki Allowed Claim for $100,000 is treated in Class 6. |
| Class 5 | Not Applicable | Not Applicable | Not Applicable |
| Class 6 | Allowed Claim of Shaya Yaki | $100,000.00 | Class 6 will receive on the Effective Date a distribution of New Common Stock through the issuance of ten shares for every dollar. The New Common Stock issued pursuant to the Plan is issued pursuant to Section 1145(a) of the Bankruptcy Code and accordingly federal and state registration and licensing laws do not apply.. |
| Class 7 | Allowed Pre-Petition Shareholders | Approximately 189 Shareholders | Class 7 will receive nothing under the Plan and all Class 7 shares will be stricken consistent with the absolute priority rule set forth in Section 1129(b)(2) of the Code. |

**8.3.    Classification and Impairment of Claims**

Claimants and Interest Holders entitled to vote under the Plan must affirmatively act in order for the Plan to be confirmed by the Court. According to the Debtor's Plan, all 7 Classes are "impaired" classes within the meaning of 11 U.S.C. § 1124. These classes, accordingly, must vote to accept the Plan in order for the Plan to be confirmed without a cramdown. A Claimant who fails to vote to either accept or reject the Plan will not be included in the calculation regarding acceptance or rejection of the Plan

A Ballot to be completed by the holders of Claims and/or interests is included herewith or will be filed in advance of the hearing on the Plan. Instructions for completing and returning the

38

ballots are set forth thereon and should be reviewed at length. The Plan will be confirmed by the Bankruptcy Court and made binding upon all Claimants and interest holders if: (a) with respect to impaired Classes of Claimants, the Plan is accepted by holders of two-thirds (2/3) in amount and more than one-half (1/2) in number of Claims in each such class voting upon the Plan, and (b) with respect to classes of interest holders, if the Plan is accepted by the holders of at least two-thirds (2/3) in amount of the allowed interests of such class held by holders of such interests. In the event the requisite acceptances are not obtained, the Bankruptcy Court may, nevertheless, confirm the Plan if it finds that the Plan does not discriminate and accords fair and equitable treatment to any class rejecting it. Your attention is directed to 11 U.S.C. § 1129 for details regarding the circumstances of such "cramdown" provisions.

## ARTICLE IX: ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Chapter 11 Bankruptcy Case; (b) the Debtor's Chapter 11 Bankruptcy Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code; or, (c) the Bankruptcy Court could consider an alternative plan of reorganization proposed by the Debtor or by some other party.

### 9.1.    Dismissal

If the Debtor's Bankruptcy Case was to be dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. Dismissal or conversion would constitute a default under the DIP Facility and all DIP Loans. Litigation with Holger Weis would no longer be stayed. Dismissal would cause a race among creditors to obtain judgment against the Debtor and then take over and dispose of the Debtor's available assets leaving all other creditors, secured and unsecured alike, with no distribution on their claims. Additionally, without use of the DIP Facility, the Debtor would be unable to maintain its IP, its most valuable asset, which would deteriorate rapidly.

### 9.2.    Chapter 7 Liquidation

If the Plan is not confirmed, it is possible that the Debtor's Bankruptcy Case will be converted to a case under Chapter 7 of the Bankruptcy Code, in which case a trustee would be appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is one under Chapter 7 or Chapter 11, Secured Claims, Administrative Claims, and Priority Unsecured Claims are entitled to be paid in full before unsecured creditors receive any funds. The Chapter 7 trustee would be entitled to receive the compensation allowed under 11 U.S.C. § 326. The trustee's compensation is based on 25% of the first $5,000 or less; 10% of any amount in excess of $5,000 but not in excess of $50,000; 5% of any amount in excess of $50,000 but not in excess of $1,000,000; and reasonable compensation not to exceed 3% percent of any amount in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the Debtor, but including holders of secured claims.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

The Debtor's IP, which is primarily comprised of patents, patent applications, and know-how relating to chemical compounds noribogaine and ibogaine and other similar or related compounds, is speculative and FDA approval has not yet been obtained. The Debtor's IP is of little use to a trustee or other parties as it requires significant specialized effort to proceed with the IND and any value in its current form is limited and purely speculative. Accordingly, a Chapter 7 trustee would likely seek to sell such IP in a fire sale, realizing a fraction of the potential value of such IP should the Plan be confirmed and the Debtor be able to proceed with Drug Development.

**9.3.    Risk Analysis**

The Debtor believes there is minimal risk to the Creditors if the Plan is confirmed. There is little or no value in the Debtor's IP today without proceeding to clinical trials leading to FDA approval. Whether the case were converted to a Chapter 7 or dismissed, failure to confirm the Plan would mean that the Debtor will never be able to realize the full value of the IP. The Plan provides for significant distributions to Creditors, including the payment in full of Allowed Claims of General Unsecured Creditors if the Debtor obtains approval of its IND to be submitted to the FDA and receives funding in a future capital raise, but such distributions will not be possible without a confirmed Plan. Failure to confirm a Plan would result in a default of the DIP Facility, and the DIP funds would be returned to the DIP lenders and would not be distributed to unsecured creditors. Notwithstanding, there are risks to interested parties in confirming the Plan because Drug Development is an inherently risky endeavor. Additionally, full payment of the Allowed Claims of General Unsecured Creditors would require both IND approval from the FDA and a successful future capital raise.

While acknowledging there are generally risks inherent to both confirmation and liquidation or dismissal, the Debtor believes that a greater recovery is possible for all Creditors through confirmation of the Plan.

## <u>ARTICLE X: CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES</u>

A summary description of certain United States federal income tax consequences of the Plan is provided below. The description of tax consequences below is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Plan as discussed herein. Only the potential material U.S. federal income tax consequences of the Plan to the Debtor and to a typical holder of claims and interests who are entitled to vote or to accept or reject the Plan are described below.

No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this Plan. No rulings or determination of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtor or to any Holder of Claims or Interests. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

40

The discussion of the U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial authorities, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date of this document. Legislative, judicial, or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the holders of claims and interests. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN.**

### 10.1.    U.S. Federal Income Tax Consequences to the Debtor

Generally, the discharge of a debt obligation owed by a debtor for an amount less than the "adjusted issue price" (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness ("COD") income to the debtor, subject to certain rules and exceptions. However, when the discharge of indebtedness occurs pursuant to a plan approved by the Bankruptcy Court in a case under title 11 of the Bankruptcy Code (e.g., a Chapter 11 case), there is a special rule under the Tax Code that specifically excludes from a debtor's income the amount of such discharged indebtedness (the so-called "bankruptcy exception"). Instead, certain of the debtor's tax attributes otherwise available generally must be reduced by the amount of the COD income that is excluded from the debtor's income. Such reduction of tax attributes generally occurs in the following order: (i) net operating losses and net operating loss carryovers (collectively, "NOLs"), (ii) general business credits, (iii) minimum tax credits, (iv) capital loss carryovers, (v) the tax basis of the debtor's property (both depreciable and non-depreciable), (vi) passive activity loss and credit carryovers, and (vii) foreign tax credit carryovers (although there is a special rule in the Tax Code which allows the debtor to elect to first reduce the tax basis of depreciable property before having to reduce NOLs and other attributes).

Under current Income Tax Regulations, the availability of the "bankruptcy exception" in the context of an affiliated group is made on a "separate entity" basis and not on an "affiliated group" basis. In addition, with regard to tax attribute reduction in the context of an affiliated group, recently adopted Income Tax Regulations (§ 1.1502-28) suggest a "hybrid" method of attribute reduction. Under the current Tax Regulations, only member corporations can file on a consolidated tax basis.

Under these regulations, the tax attributes of the separate corporate member having excluded COD income is first reduced, followed by a reduction of the tax attributes of the

41

subsidiary members (to the extent of any stock basis reduction). Then, to the extent a corporate member's excluded COD income exceeds that corporate member's separate entity tax attributes, the consolidated tax attributes allocated to the other corporate members are proportionately reduced.

### 10.2.    U.S. Federal Income Tax Consequences to an Investor Typical of the Holders of Claims and Interests

The U.S. federal income tax consequences of the implementation of the Plan to the Claimants, typical of the holders of claims and interests who are entitled to vote to confirm or reject the Plan, will depend on a number of factors, including: (i) whether the Claim constitutes a "security" for U.S. federal income tax purposes, (ii) the nature and origin of the Claim, (iii) the manner in which the holder acquired the Claim, (iv) the length of time the Claim has been held, (v) whether the Claim was acquired at a discount, (vi) whether the holder has taken a bad debt deduction or loss with respect to the Claim (or any portion thereof) in the current year or in any prior year, (vii) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (viii) the Holder's method of tax accounting, (ix) whether the Claim is an installment obligation for U.S. federal income tax purposes, and (x) the timing of any distributions under this Plan.

### 10.3.    Gain or Loss Recognition on the Satisfaction of Claims and Character of Gain or Loss

Claimants will generally not recognize gain, but may recognize loss, with respect to the amount in which the Claimants receive on their claims (generally, the amount of cash and the fair market value of any other property received in satisfaction of the Debtor's obligations) that either exceeds, on one hand, or is less than, on the other hand, the Claimant's basis in the Claim. Thus, it is possible certain Claimants may recognize a gain or loss as a result of distributions under the Plan.

In general, gain or loss is recognized by any such Claimant is either capital or ordinary in character. The character is dependent upon the underlying nature of the claim and whether such claim, in the hands of the Claimant, constitutes a capital asset. To the extent that a debt instrument is acquired after its original issuance for less than the issue price of such instrument, it will have market discount. A holder of a claim with market discount must treat any gain recognized on the satisfaction of such Claim as ordinary income to the extent that it does not exceed the market discount that has already been accrued with respect to such claim. There may also be state, local or foreign tax considerations applicable to particular holders of claims, none of which are discussed herein. Claimants should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

### 10.4.    Holders of Disputed Claims

Although not free from doubt, holders of disputed claims should only be required to report their gain or loss on the cash or other property that is ultimately distributed out to the Claimant free from any further restrictions. Holders of disputed claims are urged to consult their own tax

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

advisors regarding the taxation of their disputed claims and the timing and amount of income or loss recognized relating to the Disputed Claims Reserve.

### 10.5.    Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments may be subject to backup withholding. Under the Tax Code's backup withholding rules, a U.S. claimant may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the Claimant: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact; or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Payments made to Foreign Claimants may also be subject to withholding, which may be reduced under an applicable Treaty.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a Claimant may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

### 10.6.    Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE, IN MANY CASES, UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

### 10.7.    Circular 230 Disclaimer

**THE IRS REQUIRES WRITTEN ADVICE REGARDING ONE OR MORE U.S. FEDERAL TAX ISSUES TO MEET CERTAIN STANDARDS. THOSE STANDARDS INVOLVE A DETAILED AND CAREFUL ANALYSIS OF THE FACTS AND APPLICABLE LAW WHICH WE EXPECT WOULD BE TIME CONSUMING AND COSTLY. WE HAVE NOT MADE, AND HAVE NOT BEEN ASKED TO MAKE, THAT TYPE OF ANALYSIS IN CONNECTION WITH ANY ADVICE GIVEN IN THE FOREGOING DISCUSSION. AS A RESULT, WE ARE REQUIRED TO ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVICE RENDERED IN THE FOREGOING**

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

DISCUSSION IS NOT INTENDED OR WRITTEN TO BE USED AND CANNOT BE USED FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED BY THE IRS.

## ARTICLE XI: PROVISIONS FOR CONTESTED CLAIMS AND INTERESTS

### 11.1.   Objections to Claims

Unless otherwise ordered by the Court, all objections to Claims shall be filed by one (1) year from the Effective Date. If a Claim is objected to prior to the Confirmation Hearing, such claimant shall not have the right to vote to accept or reject the Plan until the objection is resolved, unless such claimant requests an order from the Court pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes only.

### 11.2.   No Distributions Pending Allowances

Notwithstanding any other provisions of the Plan, no payment or distribution shall be made with respect to any Claim to the extent it is a Contested Claim unless and until such Contested Claim becomes an Allowed Claim.

### 11.3.   Withholding and Distribution in Respect of Contested Claims

The Debtor will withhold that which would otherwise be distributed to holders of Claims within a given Class an amount sufficient to be distributed on account of Claims that are not Allowed Claims within that Class until the Contested Claim is resolved.

### 11.4.   Distribution in Respect of Contested Claims

Upon a Contested Claim becoming an Allowed Claim, all reserved funds with respect to such Claim shall be distributed to such Claimant. Upon a Contested Claim becoming disallowed, then the reserved funds will be distributed to Allowed Claims in order of priority.

## ARTICLE XII: EFFECT OF PLAN ON CLAIMS AND INTERESTS

### 12.1.   Revesting of Assets

On the Effective Date, title to all of the Debtor's assets except the Litigation Claims, which shall be irrevocably assigned, transferred and conveyed to the Liquidating Trust, will revest in the Reorganized Debtor, free and clear of all claims and interests, except as otherwise expressly stated in the Plan. On the Effective Date, the Reorganized Debtor may use, acquire and dispose of all property, free and clear of all claims and interests in this case, except as otherwise provided in this Plan or the Confirmation Order.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

## 12.2. Discharge

Commencing on the Effective Date, except as otherwise expressly provided, all holders of Claims shall be precluded forever from asserting against the Debtor's estate, the Debtor or their assets, any other or further liabilities, liens, obligation, claims or equity interest, arising or existing prior to the Effective Date, that were or could have been the subject of any Claim, whether or not Allowed. As of the Effective Date, the Debtor shall be discharged, and shall hold the assets received or retained by and pursuant to the Plan, free and clear of all liabilities, liens, claims and obligations or other claims of any nature against the Debtor or its estate, except those duties and obligations created by the Plan.

This Plan provides that upon the Effective Date, the Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. § 1141. However, any liability imposed by the Plan will not be discharged.

## 12.3. Final Decree

Once the estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Debtor or the Liquidating Trustee, as the case may be, or such other parties as the Court shall designate in the Confirmation Order shall file a motion with the Court to obtain a final decree to close the case.

## 12.4. Injunction

In accordance with section 524 of the Bankruptcy Code and section 105(a) of the Bankruptcy Code, the discharge provided by this Plan and section 1141 of the Bankruptcy Code, and the injunction issued pursuant to this Plan and the Court's powers under section 105(a) among other things, acts as a permanent injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the Claims or Interests against the Debtor. All Classes, and the members thereof, all Creditors, and all Interested Parties shall be bound by this injunction pursuant to both 524(a) and 105(a).

Within ten (10) days of the Effective Date, all pending litigation against the Debtor, including the Holger Weis arbitration proceeding, shall be dismissed with prejudice. The Plaintiff in any such pending litigation shall cooperate with the Defendants in filing appropriate Stipulations of Dismissal consistent with, and in accordance with, the applicable rules of the court where there is pending litigation. Failure to so dismiss shall relieve the Reorganized Debtor from providing a Distribution to the non-cooperating Plaintiff and to any non-cooperating Defendants. In the event the Plaintiff fails to dismiss the lawsuit as set forth herein, the Reorganized Debtor may seek the entry of an order of the Court directing the Plaintiff to dismiss the relevant litigation, which order may be enforced by the Court.

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR EQUITY INTEREST IN THE DEBTOR AND OTHER PARTIES IN**

45

INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, OR PRINCIPALS, ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM: (I) COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION, OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTOR OR REORGANIZED DEBTOR WITH RESPECT TO ANY SUCH CLAIM OR EQUITY INTEREST; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTOR OR REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM OR EQUITY INTEREST; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR OR REORGANIZED DEBTOR OF ANY SUCH CLAIM OR EQUITY INTEREST; (IV) COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION, OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CLAIMS AND CAUSES OF ACTION WHICH ARE EXTINGUISHED OR RELEASED PURSUANT TO THE PLAN; AND (V) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

UNLESS OTHERWISE PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL INJUNCTIONS OR STAYS ARISING UNDER OR ENTERED DURING THE CHAPTER 11 CASE UNDER 11 U.S.C. §§ 105 OR 362, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE LATE OF THE EFFECTIVE DATE OR THE DATE INDICATED IN SUCH APPLICABLE ORDER.

NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE FOREGOING RELEASES AND INJUNCTIONS SHALL NOT PROHIBIT OR IMPAIR THE RIGHTS OF ANY PARTIES TO COMMENCE OR PURSUE ACTIONS BASED ON FRAUD OR VIOLATIONS OF APPLICABLE SECURITIES LAW.

### 12.5.  Exculpation

Except as otherwise specifically provided herein, the Debtor, its officers, directors, members, managers, employees, representatives, attorneys, financial advisors, agents, affiliates, or any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a Claim or an interest, or any other party in interest, or any of their respective officers, directors, employees, representatives, attorneys, financial advisors, partners, members of partners, managers or members of partners, or agents, or affiliates, or any of such parties' successors and assigns, for any act or omission in connection with (1) the preparation of this Plan; (2) the administration of this Case; (3) the pursuit of Confirmation of the Plan; or (4) the distribution of property under the Plan, except for their willful misconduct, bad faith, breach of fiduciary duty or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

**12.6.    Savings Clause**

If any article, section, terms and/or subdivision of this Plan is ruled by the Bankruptcy Court to be improper or ineffective, or, if the Debtor decides to unilaterally remove any article, section, subsection, term, and/or provision of this Plan at the Confirmation Hearing, this Plan shall proceed to confirmation and be confirmed without the article(s), section(s), subsection(s), term(s), and/or provision(s) found to be improper or ineffective and/or unilaterally removed by the Debtor at the Confirmation Hearing.

**12.7.    No Waiver of Causes of Action or Right to Set Off**

No provision of this Plan or the acceptance of any distributions hereunder shall compromise, settle or release any claims or causes of action belonging to the Debtor. On the Effective Date, the Liquidating Trust shall be authorized to commence and prosecute all claims that arose before, on or after the Petition Date. Proceeds, if any, realized from any such claims shall be distributed in accordance with this Plan and the Liquidating Trust Agreement. The Debtor reserves the right to set off any future payments pursuant to this Plan consistent with any future judgments which alter the amount or liability to Claims receiving payments pursuant to the Plan.

## ARTICLE XII: EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**13.1.    Leases and Executory Contracts**

The Bankruptcy Code gives the Debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Rejection or assumption may be affected pursuant to a plan of reorganization.

On the Effective Date, every executory contract and unexpired lease of the Debtor will be deemed assumed unless specifically rejected by separate motion filed prior to the Confirmation Hearing.

If an executory contract or unexpired lease is rejected, then the other party to the agreement may file a Claim for damages incurred by reason of rejection within such time as the Bankruptcy Court may allow. In the case of rejection of employment agreements and leases of real property, damages are limited under the Bankruptcy Code. The Debtor is not aware of any leases or executory contracts to be rejected at this time. To the extent there are any executory contracts or leases rejected by the Debtor, **ANY PROOF OF CLAIM FOR DAMAGES ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR LEASE MUST BE FILED WITH THE COURT WITHIN THIRTY DAYS AFTER THE ENTRY OF THE ORDER CONFIRMING THE PLAN.**

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

## ARTICLE XIV: EFFECTIVENESS OF THE PLAN

### 14.1.    Conditions Precedent – Entry of Confirmation Order

The Plan shall not become effective unless and until the Court shall have entered the Confirmation Order confirming and approving the Plan in all respects by the Confirmation Date and the Confirmation Order shall become a Final Order.

### 14.2.    Waiver of Deadlines or Other Conditions

As contemplated by the definition of Confirmation Date and Effective Date herein, the deadlines set forth above may be extended (if necessary) or as may be necessary to reasonably accommodate the Court's Calendar.

### 14.3.    Default Remedies

If the Debtor fails to perform as required by this Plan, the Debtor shall be in default. In the event of a default, an affected Creditor shall provide written notice to Debtor as set forth in Article XVI, 16.8, and the Debtor shall have ten working days thereafter to cure the default. If the Debtor fails to cure the default, the discharge and the injunctive provisions of this Plan will no longer be applicable to this creditor, and the creditor may proceed to enforce its rights under state law.

## ARTICLE XV: ADMINISTRATIVE PROVISIONS

### 15.1.    Retention of Jurisdiction

The Court shall retain jurisdiction over all matters arising in or related to the Chapter 11 Case, the Plan, the and the Liquidating Trust with respect to all claims against the Debtor, for the following purposes:

i.    To hear and determine pending motions for the assumption or rejection of the executory contracts or unexpired leases and disputed issues concerning termination of contracts, if any are ending, and the allowance of Claims resulting therefrom;

ii.    To determine any and all pending adversary proceedings, contested matters, applications and unresolved motions;

iii.    To hear and determine timely and proper objections to Claims and Interests filed both before and after the Confirmation Date by the Reorganized Debtor, including objections to the classification, estimation, establishment of priority or status of any Claim or Interest, and to allow or disallow any Contested Claim or Interest, in whole or in part, as contemplated in the Plan;

iv.    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

v.  To consider modifications of the Plan, if any, to cure any defect or omission, or reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order;

vi.  To hear and determine all claims and causes of action to recover Assets of the Debtor or Reorganized Debtor, wherever located, including any causes of action under applicable sections of the Bankruptcy Code;

vii.  To hear and determine all controversies arising in connection with the Plan and other matters provided for in the Confirmation Order; and

viii.  To hear and determine all controversies arising in connection with this Plan and its implementation, to interpret this Plan, and to enter a final decree closing the Chapter 11 case.

## ARTICLE XVI: MISCELLANEOUS

### 16.1.  Special Tax Provisions

Pursuant to 11 U.S.C. § 1146(a), any post-Confirmation Date transfer from the Debtor to any person pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable law, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan.

### 16.2.  Existing Organizational Documents

The Debtor's Existing Organizational Documents shall not be amended, modified or changed in any respect that would affect the Distributions required by this Plan.

### 16.3.  Headings

Headings are used in the Plan for convenience and reference only and shall not constitute a part of the Plan for any purpose.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336

### 16.4.    Binding Effect

The Plan shall be binding on and inure to the benefit of the Debtor, the Reorganized Debtor, and all of the holders of Claims and Interests and their respective successors and assigns.

### 16.5.    Modifications of Plan and Related Documents

The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend or modify the Plan in any manner necessary prior to entry of the Confirmation Order. After entry of the Confirmation Order, the Debtor may: (1) amend or modify the Plan and documents related thereto in accordance with, and to the extent permitted by, section 1127(b) of Bankruptcy Code and Bankruptcy Rule 3019, or (2) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 16.6.    Filing or Execution of Additional Documents

On or before the Effective Date, the Debtor shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 16.7.    Substantial Consummation

The Plan shall be deemed substantially consummated upon the Effective Date.

### 16.8.    Notices

All notices, requests, demands and other communications to or upon the Debtor shall be in writing and shall be delivered by email and by U.S. Mail (postage prepaid) to all of the following:

DemeRx, Inc.
c/o Deborah C. Mash
1951 NW 7th Avenue, Suite 300
Miami, Florida 33136
dmash@demerx.com

Geoffrey S. Aaronson, Esq.
One Biscayne Tower, 34th Floor
2 S. Biscayne Blvd.
Miami, Florida 33131
gaaronson@aspalaw.com

Samuel J. Capuano, Esq.
One Biscayne Tower, 34th Floor
2 S. Biscayne Blvd.
Miami, Florida 33131
scapuano@aspalaw.com

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

### 16.9.  Inquiries

Any inquiries with respect to this Plan should initially be made to your counsel. Any responses to specific inquiries have not been pre-approved by the Court. Nevertheless, informal inquiry about the terms and conditions of this Plan may be made to Geoffrey S. Aaronson or Samuel J. Capuano at the telephone number set forth below.

### ARTICLE XVII: CONCLUSION

THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS DESIRABLE AND IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS.

This Plan provides for equitable distributions to all Classes of the Debtor's creditors. Any alternative to confirmation of the Plan, such as liquidation under Chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation, and costs. More importantly, the Plan proposes a distribution to unsecured creditors greater than such creditors would receive in the absence of the Plan. The Debtor believes that a plan filed by another party in interest could only be confirmed over the objection of one or more impaired Classes and would generate costly and time-consuming litigation. Any delays in the confirmation of the Plan would jeopardize the viability of the Debtor as a going concern, and therefore diminish the probability of distributions to unsecured creditors. The Debtor believes its creditors will receive greater recoveries under this Plan than those which could otherwise be achieved.

FOR THESE REASONS, THE DEBTOR URGES YOU TO RETURN YOUR BALLOT ACCEPTING THIS PLAN.

Respectfully submitted,

**Aaronson Schantz Beiley P.A.**

/s/ Geoffrey S. Aaronson
Geoffrey S. Aaronson, Esq.
Florida Bar No. 349623
gaaronson@aspalaw.com
Samuel J. Capuano, Esq.
Florida Bar No. 90946
scapuano@aspalaw.com
One Biscayne Tower
2 S. Biscayne Blvd., 34th Floor
Miami, Florida 33131
Ph: 786.594.3000
Fax: 305.424.9336
*Attorneys for Debtor*

   **I HEREBY UNDERSTAND AND CONSENT TO THE ABOVE PLAN OF REORGANIZATION AND INCORPORATED DISCLOSURE STATEMENT**:

**DemeRx, Inc.**

 /s/ Deborah C. Mash
Deborah C. Mash, CEO

Date: January 30, 2019

52

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336