UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

DEMERX, INC.,

   Debtor.

_____/

Case No.: 18-14149-RAM

Chapter 11

## DEBTORS' OMNIBUS OBJECTION TO CLAIMS

---

**IMPORTANT NOTICE TO CREDITOR:**
**THIS IS AN OBJECTION TO YOUR CLAIM**

  This objection seeks either to disallow or reduce the amount or change the priority status of the claim filed by you or on your behalf. Please read this objection carefully to identify which claim is objected to and what disposition of your claim is recommended. Upon the filing of this objection an expedited hearing on this objection will be scheduled on the date already scheduled for the confirmation hearing in accordance with Local Rule 3007-1(B)(2).

  This is an Omnibus Objection to several claims. Claimants receiving this Omnibus Objection should locate their names and claims below.

---

  Pursuant to Bankruptcy Rule 3007 and Local Rule 3007-1(B)(2), the debtor and debtor-in-possession, DemeRx, Inc. ("DemeRx" or "Debtor") objects to the following claims filed in this case:

### Advanced Technology Consulting Group

  1.  Advanced Technology Consulting Group ("ATCG") was listed on the Debtor's Schedule "F" [ECF 1] as an unsecured creditor with a claim in the amount of $2,169.82 for IT services. ATCG did not file a proof of claim in this case. ATCG continues to do business with the Debtor and ATCG has since confirmed that it is not owed any pre-petition funds by the Debtor. Accordingly, the Debtor objects to payment of this claim. The claim should be stricken.

### Sagittarius Intellectual Property LLP

  2.  Sagittarius Intellectual Property LLP ("Sagittarius") was listed on the Debtor's

Schedule "F" [ECF 1] as an unsecured creditor with a claim in the amount of $1,218.05 for patent annuities. Sagittarius did not file a proof of claim in this case. Sagittarius continues to do business with the Debtor and Sagittarius has confirmed that it is not owed any pre-petition funds by the Debtor. Accordingly, the Debtor objects to payment of this claim. The claim should be stricken.

### Certain Underwriters subs. to Policy NoDOG00404174

3.      Certain Underwriters subs. to Policy NoDOG00404174 ("Underwriters") filed a purported unsecured Proof of Claim Number 4 in the amount of $25,000.00 with a claimed basis of "deductible." Underwriters are entitled to a claim based on a deductible pursuant to Policy NoDOG00404174 (the "Policy") only to the extent of payments actually made by Underwriters subject to the deductible for employment practices liability under the Policy up to $25,000.00.

4.      Upon best information and belief, Underwriters have paid pre-petition counsel for the Debtor $13,817.61 for employment practices liability under the Policy.  Accordingly, the claim should be allowed only in the amount of funds actually paid to date by Underwriters under the Policy.

### Charles E. Koob

5.      Charles E. Koob ("Koob"), a former director of the Debtor, filed a purported unsecured Proof of Claim Number 5, contingent and unliquidated for "services performed; see attached statement." The Rider to the Proof of Claim provides that the claim is contingent and unliquidated in respect of any claims Koob has or may have against the Debtor for indemnification or for contribution arising out of the relationship between Koob and the Debtor including, *inter alia*, arising out of the Debtor's organizational documents, directors and officers liability insurance policies, and an Indemnity Agreement attached to the Proof of Claim.

6.      On October 19, 2018, the Estate's court-appointed Insolvency Administrator, Kolman Kenigsberg, served on Koob, other former directors and officers of the Debtor, and the Debtor's director and officer liability insurance carriers, a *Demand for Payment of Policy Limits & Notice of*

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

*Claim* ("Demand"). The Demand is attached hereto as Exhibit "A" and is incorporated herein. Based on the conduct, acts, and omissions of Koob as alleged in the Demand, Koob is not entitled to indemnification and the Estate is proceeding to assert significant claims against Koob.

7.      To the extent it is determined that Koob is entitled to any claim, such claim should be equitably subordinated to the claims of all other creditors and interest holders pursuant to 11 U.S.C. § 510(c)(1) as a result of Koob's conduct, acts, and omissions as alleged in the Demand.

8.      To the extent it is determined that Koob is entitled to any claim, such claim should be setoff pursuant to 11 U.S.C. § 553 as a result of Koob's conduct, acts, and omissions as alleged in the Demand.

9.      Furthermore, pursuant to 11 U.S.C. § 502(d), Koob's claim should be disallowed as the recipient of avoidable transfers unless he first disgorges such amounts to the Estate.

10.     Finally, pursuant to 11 U.S.C. § 502(e)(1)(B), Koob's claim for indemnification, contribution or reimbursement should be disallowed as the claim is contingent or, in the alternative, subordinated.

11.     Accordingly, the Debtor objects to payment of this claim. The claim should be stricken. The Debtor and the Estate reserve all rights as set forth in attached Exhibit "A" including, without limitation, the right to file an adversary proceeding against Koob and other directors and officers for setoff, damages, and other affirmative relief.

**Earl H. Clemmons**

12.     Earl H. Clemmons ("Clemmons"), a former director of the Debtor, filed a purported unsecured Proof of Claim Number 6, contingent and unliquidated for "services performed; see attached statement." The Rider to the Proof of Claim provides that the claim is contingent and unliquidated in respect of any claims Clemmons has or may have against the Debtor for indemnification or for contribution arising out of the relationship between Clemmons and the Debtor

3

including, *inter alia*, arising out of the Debtor's organizational documents, directors and officers liability insurance policies, and an Indemnity Agreement attached to the Proof of Claim.

13.     On October 19, 2018, the Estate's court-appointed Insolvency Administrator, Kolman Kenigsberg, served on Clemmons, other former directors and officers of the Debtor, and the Debtor's director and officer liability insurance carriers, a *Demand for Payment of Policy Limits & Notice of Claim* ("Demand"). The Demand is attached hereto as Exhibit "A" and is incorporated herein. Based on the conduct, acts, and omissions of Clemmons as alleged in the Demand, Clemmons is not entitled to indemnification and the Estate is proceeding to assert significant claims against Clemmons.

14.     To the extent it is determined that Clemmons is entitled to any claim, such claim should be equitably subordinated to the claims of all other creditors and interest holders pursuant to 11 U.S.C. § 510(c)(1) as a result of Clemmons' conduct, acts, and omissions as alleged in the Demand.

15.     To the extent it is determined that Clemmons is entitled to any claim, such claim should be setoff pursuant to 11 U.S.C. § 553 as a result of Clemmons' conduct, acts, and omissions as alleged in the Demand.

16.     Furthermore, pursuant to 11 U.S.C. § 502(d), Clemmons' claim should be disallowed as the recipient of avoidable transfers unless he first disgorges such amounts to the Estate.

17.     Finally, pursuant to 11 U.S.C. § 502(e)(1)(B), Clemmons' claim for indemnification, contribution or reimbursement should be disallowed as the claim is contingent or, in the alternative, subordinated.

18.     Accordingly, the Debtor objects to payment of this claim. The claim should be stricken. The Debtor and the Estate reserve all rights as set forth in attached Exhibit "A" including, without limitation, the right to file an adversary proceeding against Clemmons and other directors and officers for setoff, damages, and other affirmative relief.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

### Henry Mellon

19.     Henry Mellon ("Mellon"), a former director of the Debtor, filed a purported unsecured Proof of Claim Number 7, contingent and unliquidated for "services performed; see attached statement." The Rider to the Proof of Claim provides that the claim is contingent and unliquidated in respect of any claims Mellon has or may have against the Debtor for indemnification or for contribution arising out of the relationship between Mellon and the Debtor including, *inter alia*, arising out of the Debtor's organizational documents, directors and officers liability insurance policies, and an Indemnity Agreement attached to the Proof of Claim.

20.     On October 19, 2018, the Estate's court-appointed Insolvency Administrator, Kolman Kenigsberg, served on Mellon, other former directors and officers of the Debtor, and the Debtor's director and officer liability insurance carriers, a *Demand for Payment of Policy Limits & Notice of Claim* ("Demand"). The Demand is attached hereto as Exhibit "A" and is incorporated herein. Based on the conduct, acts, and omissions of Mellon as alleged in the Demand, Mellon is not entitled to indemnification and the Estate is proceeding to assert significant claims against Mellon.

21.     To the extent it is determined that Mellon is entitled to any claim, such claim should be equitably subordinated to the claims of all other creditors and interest holders pursuant to 11 U.S.C. § 510(c)(1) as a result of Mellon's conduct, acts, and omissions as alleged in the Demand.

22.     To the extent it is determined that Mellon is entitled to any claim, such claim should be setoff pursuant to 11 U.S.C. § 553 as a result of Mellon's conduct, acts, and omissions as alleged in the Demand.

23.     Furthermore, pursuant to 11 U.S.C. § 502(d), Mellon's claim should be disallowed as the recipient of avoidable transfers unless he first disgorges such amounts to the Estate.

24.     Finally, pursuant to 11 U.S.C. § 502(e)(1)(B), Mellon's claim for indemnification, contribution or reimbursement should be disallowed as the claim is contingent or, in the alternative,

5

subordinated.

25.    Accordingly, the Debtor objects to payment of this claim. The claim should be stricken. The Debtor and the Estate reserve all rights as set forth in attached Exhibit "A" including, without limitation, the right to file an adversary proceeding against Mellon and other directors and officers for setoff, damages, and other affirmative relief.

### Bruce Hack

26.    Bruce Hack ("Hack") a former director of the Debtor, filed a purported unsecured Proof of Claim Number 8, contingent and unliquidated for "services performed; see attached statement." The Rider to the Proof of Claim provides that the claim is contingent and unliquidated in respect of any claims Hack has or may have against the Debtor for indemnification or for contribution arising out of the relationship between Hack and the Debtor including, *inter alia*, arising out of the Debtor's organizational documents, directors and officers liability insurance policies, and an Indemnity Agreement attached to the Proof of Claim.

27.    On October 19, 2018, the Estate's court-appointed Insolvency Administrator, Kolman Kenigsberg, served on Hack, other former directors and officers of the Debtor, and the Debtor's director and officer liability insurance carriers, a *Demand for Payment of Policy Limits & Notice of Claim* ("Demand"). The Demand is attached hereto as Exhibit "A" and is incorporated herein. Based on the conduct, acts, and omissions of Hack as alleged in the Demand, Hack is not entitled to indemnification and the Estate is proceeding to assert significant claims against Hack.

28.    To the extent it is determined that Hack is entitled to any claim, such claim should be equitably subordinated to the claims of all other creditors and interest holders pursuant to 11 U.S.C. § 510(c)(1) as a result of Hack's conduct, acts, and omissions as alleged in the Demand.

29.    To the extent it is determined that Hack is entitled to any claim, such claim should be setoff pursuant to 11 U.S.C. § 553 as a result of Hack's conduct, acts, and omissions as alleged in the

6

Demand.

30.     Furthermore, pursuant to 11 U.S.C. § 502(d), Hack's claim should be disallowed as the recipient of avoidable transfers unless he first disgorges such amounts to the Estate.

31.     Finally, pursuant to 11 U.S.C. § 502(e)(1)(B), Hack's claim for indemnification, contribution or reimbursement should be disallowed as the claim is contingent or, in the alternative, subordinated.

32.     Accordingly, the Debtor objects to payment of this claim. The claim should be stricken. The Debtor and the Estate reserve all rights as set forth in attached Exhibit "A" including, without limitation, the right to file an adversary proceeding against Hack and other directors and officers for setoff, damages, and other affirmative relief.

### Peter F. Nejes

33.     Peter F. Nejes ("Nejes"), a former director of the Debtor, filed a purported unsecured Proof of Claim Number 9, contingent and unliquidated for "services performed; see attached statement." The Rider to the Proof of Claim provides that the claim is contingent and unliquidated in respect of any claims Nejes has or may have against the Debtor for indemnification or for contribution arising out of the relationship between Nejes and the Debtor including, *inter alia*, arising out of the Debtor's organizational documents, directors and officers liability insurance policies, and an Indemnity Agreement attached to the Proof of Claim.

34.     On October 19, 2018, the Estate's court-appointed Insolvency Administrator, Kolman Kenigsberg, served on Nejes, other former directors and officers of the Debtor, and the Debtor's director and officer liability insurance carriers, a *Demand for Payment of Policy Limits & Notice of Claim* ("Demand"). The Demand is attached hereto as Exhibit "A" and is incorporated herein. Based on the conduct, acts, and omissions of Nejes as alleged in the Demand, Nejes is not entitled to indemnification and the Estate is proceeding to assert significant claims against Nejes.

7

35.     To the extent it is determined that Nejes is entitled to any claim, such claim should be equitably subordinated to the claims of all other creditors and interest holders pursuant to 11 U.S.C. § 510(c)(1) as a result of Nejes' conduct, acts, and omissions as alleged in the Demand.

36.     To the extent it is determined that Nejes is entitled to any claim, such claim should be setoff pursuant to 11 U.S.C. § 553 as a result of Nejes' conduct, acts, and omissions as alleged in the Demand.

37.     Furthermore, pursuant to 11 U.S.C. § 502(d), Nejes' claim should be disallowed as the recipient of avoidable transfers unless he first disgorges such amounts to the Estate.

38.     Finally, pursuant to 11 U.S.C. § 502(e)(1)(B), Nejes' claim for indemnification, contribution or reimbursement should be disallowed as the claim is contingent or, in the alternative, subordinated.

39.     Accordingly, the Debtor objects to payment of this claim. The claim should be stricken. The Debtor and the Estate reserve all rights as set forth in attached Exhibit "A" including, without limitation, the right to file an adversary proceeding against Nejes and other directors and officers for setoff, damages, and other affirmative relief.

40.     The undersigned acknowledges that this objection and the notice of hearing for this objection will be served on the claimant at least 14 days prior to the confirmation hearing date and that a certificate of service conforming to Local Rule 2002-1(F) must be filed with the court when the objection and notice of hearing are served.

WHEREFORE, the Debtor, DemeRx, Inc., respectfully request that the Court: (1) sustain the Debtor's objections to the aforementioned claims; (2) disallow the aforementioned claims as set forth above as legally unenforceable debts; and (3) for any other or further relief the Court deems just and proper.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

Dated: February 1, 2019.

Respectfully submitted,

**Aaronson Schantz Beiley P.A.**

/s/ Geoffrey S. Aaronson
Geoffrey S. Aaronson, Esq.
Florida Bar No. 349623
gaaronson@aspalaw.com
Samuel J. Capuano, Esq.
Florida Bar No. 90946
scapuano@aspalaw.com
One Biscayne Tower
2 S. Biscayne Blvd., 34th Floor
Miami, Florida 33131
Ph: 786.594.3000
Fax: 305.424.9336
*Attorneys for Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished: (1) on February 1, 2019 via email through the Court's CM/ECF system to all parties on the Electronic Mail Notice List below; (2) on February 1, 2019 via e-mail to swilliams@atcginc.com, kjohl@sagittariusip.com, ceh@pksllp.com, ckoob@me.com, mellonhenry@gmail.com, henry@mellongroupllc.com, pnejes@kemmerer-resources.com, brucehack1@gmail.com, and sclemmons@stephens.com; and (3) via U.S. Mail to the recipients below.

/s/ Geoffrey S. Aaronson
Geoffrey S. Aaronson, Esq.

| | |
|---|---|
| Advanced Technology Consulting Group<br>12555 Biscayne Blvd., PMB 901<br>North Miami, FL 33181 | Sagittarius Intellectual Property LLP<br>Three Globeside<br>Fieldhouse Lane<br>Marlow, Bucks<br>SL7 1HZ, United Kingdom |
| Celim Huezo, Esq.<br>P.K. Schrieffer LLP<br>100 N. Barranca Street, Suite 1100<br>West Covina, CA 91791 | Charles E. Koob<br>150 Columbus Ave., #9C<br>New York, NY 10023 |

9

| | |
|---|---|
| Peter F. Nejes<br>81 Van Houten Avenue<br>Chatham, NJ 07928 | Earl H. Clemmons<br>c/o Stephens, Inc.<br>111 Center Street FL24<br>Little Rock, AR 72201 |
| Henry Mellon<br>1201 Barley Mill Road<br>Greenville, DE 19807 | Bruce Hack<br>151 Central Park West, #10C<br>New York, NY 10023 |

**Electronic Mail Notice List**

- **Geoffrey S. Aaronson** gaaronson@aspalaw.com
- **Samuel J Capuano** scapuano@aspalaw.com
- **David C. Cimo** dcimo@cmmlawgroup.com, mmark@cmmlawgroup.com; kelly@cmmlawgroup.com
- **Jordi Guso** jguso@bergersingerman.com, fsellers@bergersingerman.com; efile@bergersingerman.com; efile@ecf.inforuptcy.com
- **Marilee A Mark** mmark@cmmlawgroup.com, ekelly@cmmlawgroup.com
- **Tamara D McKeown** tdmckeown@mckeownpa.com
- **Ari Newman** newmanar@gtlaw.com, crossmann@gtlaw.com; mialitdock@gtlaw.com; miaecfbky@gtlaw.com
- **Office of the US Trustee** USTPRegion21.MM.ECF@usdoj.gov
- **Mark J Wolfson** mwolfson@foley.com, crowell@foley.com

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336

# Exhibit "A"

# Kolman Kenigsberg, CPA, CFE
# 8200 NW 33rd Street, Suite 300
# Miami, FL 33122

October 19, 2018

### DEMAND FOR PAYMENT OF POLICY LIMITS & NOTICE OF CLAIM

**VIA FEDERAL EXPRESS,**
**FAX & EMAIL**

QBE Specialty Insurance Company
Attn: The Claims Manager
Wall Street Plaza
88 Pine Street, 18th Floor
New York , NY 10005
Fax: (212) 894-7899
Email professional.liability.claims@us.qbe.com

**VIA FEDERAL EXPRESS**
**INT'L & EMAIL**

CFC Underwriting Limited
85 Gracechurch Street
London EC3V 0AA
United Kingdom
Email: newclaims@cfcunderwriting.com

Re:   In re DEMERX, INC., Debtor (the "Company" or the "Debtor")
       Case No. 18-14149-BKC-RAM (Chapter 11)
       United States Bankruptcy Court
       Southern District of Florida (Miami Division)

       Insured: DEMERX INC
       Insurer: CFC Underwriting Limited
       Policy Number: DOG00404174
       Policy Limits: $3,000,000

       Insured: DEMERX INC
       Excess Insurer: QBE Specialty Insurance Company
       Policy Number: QPL0813027
       Policy Limits: $2,000,000

### Introduction

On April 9, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and continues to operate as a debtor in possession. My name is Kolman Kenigsberg, and I am the duly appointed and acting insolvency administrator (the "Insolvency Administrator") of and for the estate of the Debtor pursuant to the attached Order of the above-referenced Bankruptcy Court dated October 16, 2018.  This letter is written on behalf of the estate of the Debtor in my capacity as the Insolvency Administrator of and for the estate of the Debtor.

The purpose of this letter is to provide a notice of claim and demand (the "Demand and Notice of Claim") to the above-named insurers (the "Insurers") in regard to certain former directors

and officers of the Debtor.  The officers and directors that are the subject of this Demand and Notice of Claim include, but may not necessarily be limited to:

> Holger Weis ("Weis"), President, Chief Operating
>   Officer, Chief Financial Officer and Treasurer
> Lawrence Friedhoff, Chief Executive Officer and President
> Jeffrey L. Raney, Executive Vice President-Administration
> Charles E. Koob, Director
> Bruce Hack, Director
> Henry Mellon, Director
> Skip Clemmons, Director
> Peter Nejes, Director
> Steven Gorlin, Director

(sometimes collectively referred to herein as the "Former D&Os").

The claims against the Former D&Os are based upon alleged breaches of fiduciary duty as the result of, among other acts and omissions: (i) the failure to cause the implementation and/or enforcement or monitoring of adequate safeguards and controls in regard to material business, operational, financial reporting, and/or regulatory functions; (ii) corporate waste as the result of the improvident spending of research funds and complete lack of oversight regarding same; (iii) reckless and gross mismanagement of the Debtor's intellectual property ("IP") portfolio and complete lack of oversight regarding same; (iv) corporate waste in regard  to excessive patent prosecution and annuity costs, putting critical IP at risk of abandonment due to lack of funds and complete lack of oversight regarding same; (v) failing to fully or properly react to adverse findings from financial audits and complete lack of oversight regarding same; (vi) corporate waste regarding the improvident payment of a bonus and other excessive remuneration to Weis and complete lack of oversight regarding same; (vii) reckless dereliction and/or complete abdication of duties caused by inadequate or non-existent internal safeguards and controls or implementation and/or monitoring of same; and (viii) recklessly and improvidently operating the Debtor well past the point of insolvency and complete lack of oversight regarding same.  The basis for these claims are more fully described and explained herein.

## Background and History of the Debtor

The Debtor is a pharmaceutical development company that was incorporated under the laws of the State of Florida on March 1, 2010, for the purpose of acquiring, developing, and commercializing various intellectual property rights (patents, patent applications, know-how, etc.) relating to chemical compounds called noribogaine and ibogaine and other similar or related compounds. The Debtor is an unregistered private company with approximately 189 pre-Petition shareholders.  As a research and development company, the Debtor has no income, but it has extensive research and development expenses.

Prior to and after the Petition Date, the Debtor has been seeking to proceed with an investigational new drug application ("IND") to the United States Food & Drug Administration (the "FDA") in respect to the drugs noribogaine and ibogaine for the treatment of opioid dependence and other indications. The Debtor is ultimately seeking approval of these drugs

from the FDA in order to market these drugs as a better alternative to methadone and buprenorphine treatment for opioid addiction.

Noribogaine is an active metabolite of ibogaine. Ibogaine is an indole alkaloid that may be effective for treating opioid and other addictions in humans and is used currently in the addict self-help community for this purpose. Alkaloids are a group of naturally occurring chemical compounds that mostly contain basic nitrogen atoms. Indole, also called Benzopyrrole, is a heterocyclic organic compound occurring in some flower oils, such as jasmine and orange blossom, and other matters. It is believed that noribogaine has a lower potential for abuse than buprenorphine, methadone, and other opioids in clinical use for detoxification and treatment of opioid dependence.

Drug development of noribogaine and related molecules is based on the seminal work of the CEO, director, and founder, Dr. Deborah C. Mash ("Dr. Mash"), who is considered one of the world's leading experts on Ibogaine. Dr. Mash was a professor of neurology and molecular and cellular pharmacology for 32 years at the Leonard M. Miller School of Medicine, and founder and director of the Brain Endowment Bank at the University of Miami, in addition to holding the Jeanne C. Levy Chair. Dr. Mash established the brain bank at the University of Miami, which is one of the leading facilities in the world for the study of the human brain.

A primary focus of Dr. Mash's research at the brain bank is to understand the nature of human addiction, with a view toward defeating addiction through pharmacology. Dr. Mash learned that local people in western equatorial Africa had been utilizing a particular plant containing certain alkaloid compounds that had particular effects on the human brain. The operative substances were identified as Ibogaine. While having oneirophrenic side effects, these substances showed promise as being able to break the intractable cycle of drug addiction. Accordingly, Dr. Mash set out to identify the particular mechanisms involved in the action of ibogaine. She and her team discovered that ibogaine is metabolized to an active metabolite in the body called noribogaine. Noribogaine is a new chemical entity that has pharmacologic properties that are distinct from the parent drug - Ibogaine.

Demerx was formed and capitalized with the objective of moving Dr. Mash's molecule through the patent process, field testing, the FDA approval process, and eventually into the medical marketplace as a viable treatment to break the hold of drug addiction. Notably, the certain private placement memoranda (collectively, the "PPM") that were used to raise capital clearly stated that the Company's objective *was to develop a drug to combat opioid addiction* and not anything else.

In the United States the Debtor holds six patents and nine patent applications relating to Noribogaine, two patents and eight patent applications relating to ibogaine, six patents and one patent application relating to synthetic noribogaine, noribogaine synthesis, and intermediates, and four patents relating to noribogaine derivatives. The Debtor has approximately 18 granted foreign patents, and approximately 90 pending foreign applications directed to noribogaine synthesis, intermediates, derivatives, and/or uses of noribogaine, ibogaine, or related compounds, in countries in Europe as well as in Canada, China, Japan, India, Brazil, and Australia (all aforesaid patents and patent applications, the "IP"). Additionally, the Debtor has commenced the drug approval process with an IND to the FDA.

Dr. Mash, Steve Gorlin, and Charles Koob founded the Debtor in 2010, and thereafter the Debtor acquired the IP then held by Dr. Mash. The founding Board of Directors consisted of eight members: Steve Gorlin; Charles E. Koob; Deborah C. Mash, Ph.D.; Franklyn G. Prendergast, M.D., Ph.D.; Maj. Gen. C.A. "Lou" Hennies; Parker H. "Pete" Petit; Bruce Hack; and Steven M. Paul, M.D. The executive officers at that time were Steve Gorlin (Chairman and CEO), Charles E. Koob (Chairman of the Executive Committee and Secretary), Dr. Mash (Vice President – Research and Development and Chief Scientific Officer), Stefan Schwabe MD (COO), John C. Thomas, Jr. (CFO, Treasurer, and Assistant Secretary), and Jeffrey L. Raney, Esq. (Executive Vice President – Administration). Dr. Rudolf Kwan was hired shortly thereafter to serve as President. Dr. Douglas Kramer joined the company as its VP of Regulatory and Clinical Affairs.

In 2013, Lawrence Friedhoff MD was recruited to the Debtor as CEO & President. Other officers at that time included Dr. Mash (Vice President – Research and Development and Chief Scientific Officer), Weis (Chief Operating Officer, Chief Financial Officer, and Treasurer), and Jeffrey L. Raney, Esq. (Executive Vice President – Administration). Weis replaced Stefan Schwabe as COO in late 2012. In June 2013, due to disagreements with Dr. Friedhoff involving clinical trial designs and plans to conduct a pivotal study in New Zealand instead of the United States, Dr. Mash resigned from the Debtor's Board of Directors. Thereafter, Dr. Friedhoff resigned in 2014, and the then Board of Directors promoted Weis to President, Chief Operating Officer, and Chief Financial Officer.

Weis, a certified public accountant who started at the Company as a COO and Chief Financial Officer in 2012, took over the direction of the Clinical Development program after the departure of Larry Friedhoff in 2014. Weis was responsible for closing out the New Zealand ZPS-513 study. The ZPS-513 and DMX-100 (Canada) trials were never finalized, and there was no submission to the FDA to address the Clinical Hold that had been issued in response to the IND application submitted in 2014. The Canada DMX-100 study was insufficient to address the FDA issues because there were too few study subjects among other issues pertaining to patient selection. Apparently, all clinical trial activity ceased in 2016 due to a lack of funds. Weis also apparently sponsored a preclinical study (6-OHDA Rat Study) in 2016 for potential Parkinson's disease applications and thereafter initiated a plan to conduct a primate study. Weis also filed new intellectual property pertaining to Parkinson's disease and other movement disorders.

On July 20, 2017, the holders of a majority of the issued and outstanding shares of the capital stock of the Debtor executed, via proxies, written consents to remove Weis as President, Chief Operating Officer, and Chief Financial Officer, and also to remove the then current members of the Board of Directors, and to replace the Board with Dr. Mash, Ambassador Hans Hertell Esq., Christopher Hassan, Heather Callendar-Potters, and Richard Serbin, Esq., with Mr. Serbin to serve as the Executive Chairman of the Board. On July 24, 2017, Weis resigned as President, Chief Operating Officer, and Chief Financial Officer, and from the Board.

Prior to the Petition Date, Weis commenced an arbitration proceeding with the American Arbitration Association against the Debtor styled *Holger Weis v. Demerx, Inc.*, Case No. 01-17-0006-8886 relating to a compensation dispute. The Debtor believes it possesses

defenses to, and counterclaims against Weis. Thereafter, Dr. Mash recruited and signed an employment agreement with Dr. Robert Reder, the Debtor's current Vice President for Clinical Research and Development. Dr. Reder is an expert in opioid drugs, having worked at both Purdue Pharma and Endo Pharmaceuticals, and he has substantial FDA experience throughout all stages of pharmaceutical development lifecycle. In September of 2017, Michael Karukin Ph.D. joined the company as its Chief Operating Officer. Dr. Karukin worked for many years at Ivax as a clinical trial manager, and then transitioned to lead the REMS program (Risk Evaluation and Mitigation Strategies) at Teva Pharmaceuticals USA. In 2018, John Thomas returned to the Debtor to serve as its Chief Financial Officer.

The Debtor's pre-petition debt is comprised of: (1) the $135,000 secured obligation to Philip Sigel, Debtor; (2) the disputed unsecured claim of approximately $621,000 by the former President, Weis; (3) the Debtor's former IP counsel Foley & Lardner's disputed unsecured legal fees claim of approximately $780,000; (4) certain other undisputed unsecured legal fees totaling approximately $149,000; (5) certain unpaid unsecured consulting fees, research and development costs, and other debts totaling approximately $311,000; and (6) certain unsecured loans to the company in the amount of approximately $120,000 from Dr. Mash and Steve Gorlin. No taxes were due and owing on the Petition Date.

As to equity, pursuant to the Debtor's Articles of Incorporation, as amended, the Debtor was authorized to issue 50,000,000 shares of capital stock, of which 35,000,000 shares were designated as Common Stock and 15,000,000 shares were designated as Preferred Stock. Prior to the Petition Date, the Debtor issued 6,803,763 shares of Common Stock, 7,000,000 shares of Series A Preferred Stock to an initial round of investors, and 3,837,720 shares of Series B Preferred Stock to a second round of investors, to a total of approximately 189 shareholders.

## Summary of Claims & Facts Supporting the Claims

The estate of the Debtor seeks damages for breach of fiduciary duty based upon various acts and omissions of the Former D&Os (collectively, the "Wrongful Acts"). The Wrongful Acts identified to date include breaches of fiduciary duty, aiding and abetting breach of fiduciary duty, and corporate waste, along with gross and/or willful neglect of duties, abdication of duties, errors, and omissions to act and/or state material facts known to the Former D&Os when such statements were necessary, and the failure to implement or otherwise follow adequate safeguards and controls.

Weis and the Former D&Os engaged in multiple and continuing breaches of fiduciary duty with respect to material business, financial, regulatory and operational functions of the Company. To be clear, the duty of the Former D&Os to implement, follow, monitor, and supervise included *their obligation* to assure themselves that information and reporting systems existed within the organization that were reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance. The Former D&Os utterly failed to implement any reporting or information system or controls or, having implemented certain such systems or controls, consciously failed to follow, monitor, or oversee the Company's operations, thereby disabling themselves from being informed of risks or problems requiring their attention. The Former D&Os knew that they were not discharging their fiduciary obligations, and they failed to act in the face of a known duty to

act, thereby demonstrating a conscious disregard for their responsibilities. They likewise knowingly tolerated inadequate internal controls and knowingly failed to monitor compliance with legal, financial, regulatory, operational and other required duties and obligations.

During the years 2015 through 2017, Weis engaged in numerous acts and omissions that were detrimental to Demerx, including:

- Weis became interested in Parkinson's disease. After he had read an article in the internet about Parkinson's, he decided to involve the Company in a study as to whether Noribogaine would treat Parkinson's disease - an effort utterly at odds with the application of funds specified in the PPM (treatment of opioid addition). He obligated the Company to pay $94,000 to an investigative contract research company, then incorrectly reported to the Board of Directors that the results were "promising" and "encouraging," which the directors failed to independently assess. He then filed for patents listing himself as the inventor and caused the Company to become indebted to attorneys handling the patent application.

- The FDA put the Company's research project on a "full clinical hold" in 2014. A potential investor, "Keiretsu" was interested in providing funding. Weis advised Keiretsu that "Noribogaine is now ready to enter phase 2 clinical testing." But Demerx was not "ready" because of the FDA's full clinical hold imposed in 2014. Weis also advised Keiretsu that Demerx had "addressed the FDA's concerns," which was materially inaccurate, as Demerx had not contacted the FDA since the time the hold was imposed in 2014.

- Based upon Weis' presentations to the Board, and the Board's failure to fully or properly oversee Weis and/or to independently verify the information he was providing as part of the monitoring and control function, certain performance benchmarks were claimed to have been achieved, when in fact they had not, thereby allowing Weis to be paid cash bonuses and other excessive remuneration.

- Essential to the progress of the clinical investigation were certain studies known as the DMX 100 and the ZPS 513. Weis failed to complete the final clinical study reports. He also failed to file the FDA - required Investigational New Drug annual reports as per 21CFR Section 312.33.

- The Company hired a firm to conduct a study in New Zealand. The Chief Investigator wrote the following regarding Weis' behavior: "He behaved appallingly at the time the patient study was finishing, refusing to pay for completed work, demanding editorial control of the manuscripts (that's why they took so long to get published....)".

- Demerx spent in excess of $1 million dollars in field-testing the material on nine patients in Canada. Essential to any such study is a Statistical Analysis Plan ("SAP") which serves as a guide to the statisticians compiling the data to go into a final report for the study. The SAP was never finalized. Accordingly, the data could not be analyzed nor could the requisite report be finished for submission to the FDA. Nonetheless, Weis inaccurately reported that the study had been completed.

- Weis wrongfully awarded himself back bonus payments and a "golden parachute," rubber-stamped by the board without independent assessment and consideration, that comprises the majority of his $621,384.81 claim against DemeRx. Notably, Weis reported in a due diligence document dated July 21, 2017 which he had prepared for Kieretsu Capital LLC, that as of June 30, 2017, he had unpaid accrued compensation of only $135,000.

In sum, Weis, along with the abdication and complete failure of the remaining Former D&Os to fully or properly discharge their oversight and monitoring duties, caused the Debtor to engage in substantial corporate waste, demonstrating that the Former D&Os were not engaging in a process to make reasonably informed disinterested decisions in the best interests of the Company. The Former D&Os completely abdicated their oversight duties and/or sought and engaged in various activities and decisions which they knew or should have known would result in the Company having inadequate capitalization for its future operations.    These circumstances are evidenced by Wrongful Acts involving corporate waste and the willful and repeated failure of the Former D&Os to cause the implementation and/or enforcement of adequate safeguards and controls in regard to material business, operational, financial reporting, and/or regulatory functions involving the following:

### A.  Reckless and Improvident Spending of Research Funds

Following the issuance of the outside independent auditor's report in May 2016, Weis redirected funding totaling $213,000 to a project outside the scope the PPM previously issued by the Debtor.  Weis committed $213,000 for a Parkinson's Rat study with Psychogenics for which Demerx now owes the vendor $94,000. Monies were owed to multiple vendors who provided services to the clinical development program. As a result, Clinical Study Reports were never completed under Weis' direction. The Company is also prohibited from filing reports from these studies to the FDA until the reports are complete and in proper form. Weis, meanwhile, incorrectly advised the board of directors and potential investors that he was prepared to start Phase II clinical studies in USA, but the directors never independently sought to confirm such misinformation. The remaining Former D&Os wholly abdicated their duties by failing to fully or properly monitor and oversee Weis in regard to foregoing acts and omissions, or to ensure that adequate safeguards and controls were implemented and/or followed to fully and properly oversee Weis.

### B.  Gross Mismanagement of the Debtor's Intellectual Property Portfolio

Weis, who had no prior expertise sufficient to effectively run a clinical stage development company or understand Demerx's business, and the remaining Former D&Os placed critical IP assets at risk.  To this end, Weis named himself as inventor on patents pertaining to Parkinson's Disease based on an internet post, and  mismanaged IP costs resulting in a negative pledge on the company's IP portfolio.  Weis also ran up costs to Demerx of over $868,000 in 2016 and incurring over $556,000 in debt to the patent attorneys when the Company had received a "going concern" opinion from the outside independent  auditors.  Weis and the remaining Former D&Os engaged in corporate waste in regard to excessive patent prosecution and foreign annuity costs, putting critical IP at risk of abandonment due to lack of funds. The remaining Former D&Os likewise wholly abdicated their duties by failing to fully or properly monitor and oversee Weis in regard to foregoing acts and omissions, or to ensure that adequate safeguards and controls were implemented

and/or followed to fully and properly oversee Weis.

### C. Failing to Fully or Properly React to Adverse Findings from Financial Audits

On May 4, 2016, the Company's outside independent auditor reported there was "substantial doubt" about the Company's ability to continue as a "going concern." On May 12, 2016, Weis stated in an email to board of directors "I'm not aware of any findings." On June 9 2016, he submitted a copy of the memo to the audit committee, but failed to point out the critical issues raised by the auditor. Weis provided no explanation in the email to board of directors and no minutes from the audit committee meeting was found in Company's Cloud files. Weis made sure that the financial statements of the Company contained no "notes" or other information submitted to board of directors or potential investors subsequent to the "going concern" opinion. The remaining Former D&Os wholly abdicated their duties by failing to fully or properly monitor and oversee Weis in regard to foregoing acts and omissions, or to ensure that adequate safeguards and controls were implemented and/or followed to fully and properly oversee Weis.

### D. Corporate Waste Regarding the Improvident Payment of an Excessive Bonus and Other Excessive Remuneration to Weis

Weis and the Former D&Os allowed Weis to engage in corporate waste by allowing him to be paid or entitled to be allowed stock, a golden parachute, cash payments, and other excessive compensation based on milestones never achieved. Weis wrote his own performance evaluation and submitted them to the compensation committee. Weis painted a "rosy picture" overstated accomplishments and achievements and progress of a financing plan. Weis and the Former D&Os allowed Weis to make unauthorized payments to himself on last day of work, withdrawing all remaining funds from the Debtor's bank account. Weis also made certain to pay his future life insurance. The remaining Former D&Os wholly abdicated their duties by failing to fully or properly monitor and oversee Weis in regard to foregoing acts and omissions, or to ensure that adequate safeguards and controls were implemented and/or followed to fully and properly oversee Weis.

### E. Failure to Fully and Properly Maintain Regulatory Documentation

Weis also failed to fully and properly maintain regulatory documentation by, among other acts and omissions: (i) failing to fully or accurately report the regulatory status of the development program as ready for phase II testing to board of directors and potential investors; (ii) failing to fully or accurately report the results of anecdotal and clinical data as "promising" and "exciting" to board of directors and potential investors based on limited and unaudited results; (iii) failing to deliver 2 final integrated Clinical Study Reports (CSR's) and failed to fully or accurately report their status to board of directors and investors; (iv) failing to maintain the accuracy and completeness of clinical data listings; (vi) failing to assign qualified personnel to work on CSR's; and (vii) failing to comply with US FDA IND annual report filing requirements. The remaining Former D&Os wholly abdicated their duties by failing to fully or properly monitor and oversee Weis in regard to foregoing acts and omissions, or to ensure that adequate safeguards and controls were implemented and/or followed to fully and properly oversee Weis.

**F. Reckless Dereliction and/or Abdication of Duties Caused by Inadequate or Non-Existent Internal Safeguards and Controls and Implementation and/or Monitoring of Same**

In addition, the Former D&Os breached their duties of loyalty and good faith by failing to monitor and supervise management, and failing to implement and follow information and reporting systems within the organization that were reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance. The Former D&Os utterly failed to implement any reporting or information system or controls or, having implemented certain such systems or controls, consciously failed to follow, monitor, or oversee the Company's operations, thereby disabling themselves from being informed of risks or problems requiring their attention.   The Former D&Os knew that they were not discharging their fiduciary obligations, and they failed to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities.  They likewise knowingly tolerated inadequate internal controls and knowingly failed to monitor compliance with legal, financial, operational, and other required duties and obligations.

### The Legal Claims at Issues

Based upon the facts and circumstances supporting the Wrongful Acts described above, the specific legal claims that are the subject of this Demand and Notice of Claim include the following:

### FIRST CLAIM
### BREACH OF FIDUCIARY
### DUTY AGAINST WEIS
### (Under Florida and/or
### Other Applicable Law)

This is a claim under Florida statutory and common law for breach of fiduciary duty by the Insolvency Administrator, in his capacity as the Court-appointed Insolvency Administrator of the Debtor for the Demerx Estate, against Weis based upon Weis's acts and omissions as an officer and director of Demerx.

During at least the time periods alleged above, Weis was an officer and director of Demerx and, as such, owed such entity a fiduciary duty to discharge his duties in good faith, with the care an ordinarily prudent officer, director or manager in a like position would exercise and in a manner reasonably believed to be in the best interests of Demerx.

Specifically, the duty of loyalty and good faith under Florida or other applicable law required Weis to put the interests of Demerx above his own interests and those of others, and was not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest. In addition, in discharging his duty of loyalty and good faith, Weis was required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than

that of advancing the best interests of Demerx, and by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for his responsibilities. Weis was also required to ensure that he did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to his decisions, such that it was qualitatively more culpable than gross negligence.

Additionally, the duty to exercise due care under Florida or other applicable law required Weis to use that amount of care which ordinarily careful and prudent person would use in similar circumstances and to consider all material information reasonably available. In exercising the duty of due care, Weis could not engage in acts or omissions on behalf of Demerx that resulted in a loss to such entity arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure of Weis to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to Demerx, such that reasonable businesspersons would have carefully considered the obvious negative consequences. Moreover, the more significant the subject matter of the decision, the greater the requirement to probe and consider alternatives. To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants, and to provide materially accurate information.

Based upon the application of the foregoing duties of loyalty, good faith and due care governing Florida officers and directors, Weis knew, should have known and otherwise was required to act as follows: (i) to provide or otherwise cause materially accurate information or representations to be disseminated or made within Demerx and to third parties; (ii) to implement or follow, or to otherwise cause the implementation and following of, adequate safeguards or controls in regard to financial reporting; (iii) to implement or follow, or to otherwise cause the implementation and following of, adequate safeguards and controls in regard to material business, operational, financial, and regulatory functions; (iv) while Demerx was insolvent or not paying its debts as they became due, to undertake sufficient and adequate measures to ensure that payments to third parties did not constitute preferential and other avoidable transfers which could result in a loss of assets of Demerx; (v) while Demerx was insolvent or not paying its debts as they became due, not to cause, allow or otherwise abdicate his duties by allowing Demerx's assets and enterprise value to continue to decrease in value; (vi) while Demerx was insolvent or not paying its debts as they became due, to cause Demerx to file bankruptcy or other insolvency proceedings as soon as reasonably practical, necessary or appropriate; (vii) while Demerx was insolvent or not paying its debts as they became due, to act in the best interests of Demerx and all stakeholders, and not in the interests of himself or certain insiders of the Debtor; and (viii) to ensure that Demerx was not engaging in or otherwise permitting corporate waste.

In regard to the facts alleged above involving Demerx's flagrant business, operational, financial, and regulatory compliance deficiencies, and lacking good faith, Weis exhibited a knowing, conscious, grossly negligent or reckless disregard for the best interests of Demerx and, except for his knowing, conscious, grossly negligent or reckless disregard of the facts, he should have known of the risk of damage that ultimately befell Demerx.

Specifically, Weis actively engaged in breaches of fiduciary duties, and otherwise abdicated his fiduciary duties of loyalty, good faith, and due care owed to Demerx, with breaches that include, but that may not necessarily be limited to, the following: (i) permitting the Debtor to engage in corporate waste; (ii) failing to cause or require the implementation of or follow adequate safeguards and controls in regard to financial reporting and other material business, operational, regulatory, and financial functions; (iii) permitting Demerx to engage in certain preferential and other avoidable transfers, which resulted in a loss of assets of Demerx; (iv) permitting Demerx's assets and enterprise value to decrease in value; (v) failing to fully or adequately inform himself and the Former D&Os in regard to material business, operational, regulatory or financial decisions affecting Demerx; (vi) when Demerx was insolvent or not paying its debts as they became due, acting with the purpose of furthering the interests of himself and certain other insiders of the Debtor, instead of the best interests of Demerx and all stakeholders; and (vii) other breaches and proximately caused damages as may be ascertained through discovery.

Each of the above breaches adversely impacted and conferred no benefit to Demerx, and as a direct and proximate result of same, caused damage to Demerx, and the Insolvency Administrator on behalf of the estate of the Debtor demands payment of the remaining policy limits in full satisfaction of this claim.

## SECOND CLAIM
## BREACH OF FIDUCIARY DUTY
## AGAINST THE REMAINING FORMER D&OS
### (*Caremark*[1] Claim for Breach of Duty of Good Faith and
### Loyalty Under Florida and/or Other Applicable
### Law for Complete Abdication of Oversight Duties)

This is a claim under Florida and/or other applicable statutory and common law for breach of fiduciary duty by the Insolvency Administrator, in his capacity as the Court-appointed Insolvency Administrator of the Debtor for the Demerx Estate, against the Remaining Former D&Os based upon the Remaining Former D&Os' acts and omissions as officers, directors, and/or control persons of Demerx resulting from a complete and utter abdication of their oversight duties by the failure to cause the implementation of adequate safeguards or controls, or to otherwise fully and properly monitor Weis, and/or certain other officers or control persons of the Debtor in regard to the Debtor's business, operational, regulatory, and financial functions.

During at least the time periods alleged above, the Remaining Former D&Os were directors or control persons of Demerx and, as such, owed such entity a fiduciary duty to discharge their

---

[1] *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch.1996); *accord Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006). The *Caremark* decision applies because Florida corporate law was modeled after Delaware corporate law. *See Marquis Theatre Corp. v. Condado Mini Cinema*, 846 F.2d 86, 91 (1st Cir.1988) (looking to Delaware corporate law to determine Florida corporate law definition of the business judgment rule). *Caremark* case sets forth the legal standard and elements necessary to state a claim for breach of the duty of good faith and loyalty as a result of the failure of officers or directors to cause the implementation of adequate systems, or to employ adequate monitoring and oversight, so as to ensure that sufficient and accurate information is available to allow the board to reach informed judgments concerning a corporation's compliance with law and its business performance. *See Caremark* at 967-73.

duties in good faith, with the care an ordinarily prudent director in a like position would exercise and in a manner reasonably believed to be in the best interests of Demerx. Specifically, the duty of loyalty and good faith under Florida and other law required the Remaining Former D&Os to put the interests of Demerx above their own interests and those of others, and was not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest. In addition, in discharging their duty of loyalty and good faith, the Remaining Former D&Os were required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of Demerx, and by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities. The Remaining Former D&Os were also required to ensure that they did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to their decisions, such that it was qualitatively more culpable than gross negligence.

Further, in discharging their duties of loyalty and good faith, directors are required to monitor operations, and the failure to do so results in liability premised upon "unconsidered inaction," as opposed to an affirmative board decision to act or not act. The duty to monitor includes the board's ability to assure itself that information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance. A sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure that a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability. Thus, "oversight" liability constitutes a breach of fiduciary duty characterized by a lack of good faith. Moreover, directors appointed to and holding executive committee, practice committee, pension committee, or other specialized committee positions have heightened duties.

The necessary conditions predicate for director oversight liability include: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

Based upon the application of the foregoing duties of loyalty and good faith governing Florida officers and directors, the Remaining Former D&Os knew, should have known and otherwise were required to act as follows: (i) to implement or follow, or to otherwise cause the implementation and following of, adequate safeguards or controls in regard to financial reporting; (ii) to implement or follow, or to otherwise cause the implementation and following of, adequate safeguards and controls in regard to material business, operational, financial, and regulatory functions; (iii) to monitor, oversee, and fully and properly supervise and oversee Demerx and Weis in regard to each of the foregoing functions; and (iv) to ensure that when Demerx was insolvent or not paying its debts as they became due, to act with the purpose of furthering best interests of Demerx and all stakeholders, instead of the interests of Weis and certain other insiders of the Debtor.

In regard to the facts alleged above involving Demerx's flagrant business, operational, financial, and regulatory compliance deficiencies, and lacking good faith, the remaining Former D&Os exhibited a knowing, conscious, grossly negligent or reckless disregard for the best interests of Demerx and, except for their knowing, conscious, grossly negligent or reckless disregard of the facts, they should have known of the risk of damage that ultimately befell Demerx.

Specifically, the remaining Former D&Os engaged in breaches of fiduciary duties, and otherwise abdicated their fiduciary duties of loyalty and good faith owed to Demerx, with breaches that include, but that may not necessarily be limited to, failing to implement adequate safeguards and controls in regard to financial reporting and other material business, operational, regulatory, and financial functions, including the failure to fully or properly monitor, oversee, and supervise the activities of Weis and Demerx in regard to same, and failing to ensure that when Demerx was insolvent or not paying its debts as they became due, Weis was acting with the purpose of furthering the best interests of Demerx and all stakeholders, instead of the interests of Weis and certain other insiders of the Debtor.

Thus, the remaining Former D&Os knowingly breached their oversight duties by utterly failing to implement any reporting or information system or controls or, having implemented such a system or controls, consciously failed to monitor, oversee, or supervise the Debtor's operations and the activities of Weis, thereby disabling themselves from being informed of risks or problems requiring their attention and, in so doing, they knew that they were not discharging their fiduciary obligations. Moreover, as a result of their inaction, the remaining Former D&Os failed to act in the face of known duties to act, thereby demonstrating a conscious disregard for their responsibilities, and as a result breaching their duty of loyalty by failing to discharge such fiduciary obligations in good faith.

Each of the above breaches adversely impacted and conferred no benefit to Demerx, and as a direct and proximate result of same, caused damage to Demerx, and the Insolvency Administrator on behalf of the estate of the Debtor demands payment of the remaining policy limits in full satisfaction of this claim.

## THIRD CLAIM
## ACTION TO AVOID AVOIDABLE TRANSFERS UNDER
## APPLICABLE FLORIDA AND FEDERAL BANKRUPTCY LAW
### (Against the Former D&Os)

This is a claim to avoid and recover avoidable transfers pursuant to applicable Florida and federal bankruptcy law.

Pursuant to 11 U.S.C. §§ 544 and 548 and/or applicable Florida law, the Debtor may avoid: (i) any transfer or obligation, and recover any transfer of property of the debtor, made without receiving reasonably equivalent value in exchange for the transfer when the debtor was insolvent at the time or became insolvent as a result of the transfer, or where the debtor knew or should have known that it would incur debts beyond its ability to pay as such debts matured; and (ii) any transfers that were made to hinder or delay creditors within two years (under federal law) and four years (under Florida law) of the Petition Date.

Pursuant to 11 U.S.C. § 547, the Debtor may also seek to avoid any transfer of an interest of the debtor in property — (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; 4) made — . . . between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if — (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

During and after their terms as officers and/or directors of the Debtor, each or certain Former D&Os received compensation, payments, or other transfers from Debtor in the form of salaries, bonuses, distributions, and/or improper excessive or non-business related expense reimbursements (the foregoing transfers, along with any and all other transfers during the two years prior to the Petition Date, shall collectively be referred to as the "transfers"). At the time such transfers were made, the Debtor was insolvent and/or knew or should have known that it was incurring or would be incurring debts beyond its ability to pay as such debts as they matured.

Based upon the acts and omissions of the Former D&Os referred to above, the Debtor did not receive reasonably equivalent value for the purported services performed by the Former D&Os. Alternatively, the transfers were made with actual intent by Debtor to hinder or delay creditors of Debtor, and the Former D&Os did not receive such transfers in good faith due to their knowledge of the impaired financial condition of Debtor.

As to the payments made within one year of the Petition Date, the transfers alternatively constitute preferential transfers pursuant to Section 547 of the Bankruptcy Code in that such transfers were made to or for the benefit of a creditor, the Former D&Os, for or on account of an antecedent debt owed by the Debtor before such transfers were made, made while the Debtor was insolvent, and that enabled such creditors to receive more than they would have received if the cases were under chapter 7 of this title, if the transfers had not been made, and such had creditors received payment of such debts to the extent provided by the provisions of title 11. Pursuant to 11 U.S.C. §§ 544, 547, 548 and 550 and/or applicable state law, the Debtor is entitled to recover from the Former D&Os the value of the property transferred.

In accordance with 11 U.S.C. §§ 544, 547, 548, and 550 and/or applicable state law, the estate of the Debtor demands that the Former D&Os disgorge the full value of the Transfers made to each of them.

### Damages and Harm to Debtor and the Estate

While the investigation is ongoing, a non-exhaustive list of breaches of duty of loyalty, good faith and due care by the Former D&Os owed to the Debtor identified to date includes the following: (i) wrongfully causing, approving, allowing, acquiescing in and/or otherwise abdicating their duties in regard to payments made to Weis; (ii) failing to implement and/or follow sufficient or adequate safeguards, controls, and procedures to prevent corporate waste; (iii) failing to fully or timely undertake sufficient or adequate measures to ensure regulatory compliance; (iv) failing to keep adequate financial records in a commercially reasonable manner, thereby interfering with the Debtor's ability to fulfill its statutory duties; (v) permitting the Company's assets and enterprise value to decrease in value; (vi) administrative fees and expenses incurred by the bankruptcy

estates, and claims filed or asserted against such estates, during the bankruptcy proceedings, including those incurred in regard to resolving the document and record deficiencies of the Debtor; (vii) the value of all avoidable transfers pursuant to Chapter 726 of the Florida Statutes or other applicable law that resulted from the failure of, among other things, the Former D&Os to cause the Debtor to file bankruptcy sooner; and (viii) other damages as may be ascertained though discovery.

Additional damages include the following:

- During the time that Weis was in charge of the Debtor, it is estimated that Weis and the remaining Former D&Os caused corporate waste, damages, and harm to the Debtor in the amount of approximately $10-12 million as the direct result of their acts and omissions, including complete and utter failure to implement adequate safeguards and controls and complete lack of oversight, that caused the Debtor to engage in activities and other improvident conduct beyond the scope of the PPM and that was otherwise fundamentally flawed;

- $621,384.81 in alleged damages asserted by Weis against the Company;

- $556,000 to cover negative pledge on the IP to Foley Lardner;

- $379,000 in an undeserved bonus and retroactive pay, which the board failed to independently evaluate;

- $200,000 to cover the costs for specialized regulatory consultations updates to various documents and study reports as required by FDA for IND submissions and new protocols to get off clinical hold due to sloppy work and lack of communications to the agency by Weis;

- $130,000 to cover debt to Zenith's for ZPS-513;

- $94,000 to cover back debt to Psychogenics for Parkinson's Rat study;

- $25,000 to cover costs for correcting errors and omissions in order to finalize the CSR's on DMX-100 and ZPS-513;

- $4,405 for prepayment of a full year of a life insurance policy on the day Weis resigned; and

- At least an additional $1,175,000 to cover the costs associated with the bankruptcy proceeding which was precipitated by the actions of Weis and the Former D&Os, and which includes at least an additional $600,000 to cover the cost of drug development including proceeding to IND approval with the FDA, which Weis and the Former D&Os failed to pursue.

### Demand that All Known Insurance
### Carriers be Placed on Notice of the Claims

In addition, on behalf of the estate of the Debtor, I, in my capacity as Insolvency Administrator of Debtor's estate, hereby demand that the Former D&Os immediately place on notice any and all insurance carriers, including the Insurers identified above, which provide, or may provide, coverage for the Wrongful Acts described herein, and I further demand that all Former D&Os independently provide the Insurers, and any and all other known insurance carriers, with a copy of this Demand Letter and Notice of Claim prior to October 30, 2018 at 11:59 a.m.

### Demand for Tender of Policy Limits

The damages at issue in regard to the claims against the Former D&Os total in excess of $5 million. I, as the duly appointed Insolvency Administrator acting for an on behalf of the estate of the Debtor, hereby demand payment of the remaining policy limits, which I understand to be not meaningfully less than $5 million. This demand for payment will remain open through the close of 30 calendar days after the date of this letter, after which it shall expire without any further action. In the event payment of the full remaining limits is timely received, I, on behalf of the estate of the Debtor, will seek approval of the payment with the Bankruptcy Court, which will include a request for a release of the Former D&Os.

### Reservation of Rights

This letter should not be construed as a complete statement of all claims that I, as Insolvency Administrator of the estate of Debtor, or the estate of the Debtor, has against the Former D&Os or other parties, and on behalf of the estate of the Debtor, the estate and myself hereby reserve the right to prepare and prosecute such other claims as the ongoing investigation reveals are appropriate. As additional information supporting the claims and demand set forth herein becomes available, such information will be provided.

Please direct any and all future correspondence and communications regarding this matter to our attention using the below contact information:

Kolman Kenigsberg,
Insolvency Administrator
8200 NW 33rd Street, Suite 300
Miami, FL 33122
Email:

With copies to:

Geoffrey S. Aaronson, Esq.
Samuel J. Capuano, Esq.
Aaronson Schantz Beiley P.A.
One Biscayne Tower
2 S. Biscayne Blvd, 34th Floor
Miami, Florida 33131
Tel: 786.594.3000

Fax: 305.424.9336
Email: gaaronson@aspalaw.com
Email: scapuano@aspalaw.com

David C. Cimo, Esq.
Marilee A. Mark, Esq.
Special Litigation Counsel for the Debtor
CIMO MAZER MARK PLLC
100 S.E. 2nd Street, Suite 3650
Miami, FL 33131
Tel: 305.374.6482
Fax: 305.374.6488
Email: dcimo@cmmlawgroup.com
Email: mmark@cmmlawgroup.com

Sincerely,

Kolman Kenigsberg,
Insolvency Administrator

cc: Dr. Deborah Mash (via email)
    Former officers and directors of the Debtor on the attached Service List

## SERVICE LIST

Holger Weis
1212 SE 11th Street,
Fort Lauderdale, FL 33316
Email: weis.holger@gmail.com

Jordi Guso, Esq
Attorney for Holger Weis
Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Email: jguso@bergersingerman.com

Jeffrey L. Raney
321 Sunset Drive, Unit 1
Fort Lauderdale, FL 33301
Email: jeff30319@yahoo.com

Charles E. Koob
150 Columbus Ave., Apt. 9C
New York, NY 10023
Email: ckoob@stblaw.com

Bruce Hack
151 Central Park West, Apt. 10C
New York, NY 10023
Email: brucehack1@gmail.com

Henry Mellon
1201 Barley Mill Road
Greenville, DE 19807
Email: mellonhenry@gmail.com

Skip Clemmons
111 Center Street, 24th floor
Little Rock, AR 72201
Email: sclemmons@stephens.com

Peter Nejes
c/o Kemmerer Resources Corp.
323 Main Street
Chatham, NJ 07928
Email: pnejes@kemmerer-resources.com

Lawrence Friedhoff
525 River Vale Road
River Vale, NJ 07675
Email: lfriedhoff@pspg.com

Steven Gorlin
1234 Airport Rd., #105
Destin, FL 32541
Email: sgorlin@gorlincompanies.com

Case 18-14149-RAM    Doc 119    Filed 10/17/18    Page 1 of 2



**ORDERED in the Southern District of Florida on October 17, 2018.**

Robert A. Mark, Judge
United States Bankruptcy Court

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

In re:

DEMERX, INC.,

      Debtor.

_____/

Case No.: 18-14149-RAM

Chapter 11

### ORDER GRANTING DEBTOR'S MOTION TO APPOINT KOLMAN KENIGSBERG AS INSOLVENCY ADMINISTRATOR FOR THE LIMITED PURPOSE OF PROTECTING AND PRESERVING DIRECTOR AND OFFICER LIABILITY CLAIMS IN THE BEST INTERESTS OF THE BANKRUPTCY ESTATE

This matter came before the court on October 15, 2018 at 10:00 a.m. upon DemeRx, Inc.'s ("DemeRx" or "Debtor") *Motion to Appoint Kolman Kenigsberg as Insolvency Administrator for the Limited Purpose of Protecting and Preserving Director and Officer Liability Claims in the Best Interests of the Bankruptcy Estate and Request for Expedited Hearing* [ECF 111] (the "Motion"). The court having reviewed the Motion, having considered argument of counsel, and good and sufficient cause appearing, it is therefore

    **ORDERED** as follows:

    1.    The Motion is granted as set forth hereunder.

2.    Kolman Kenigsberg is appointed as insolvency administrator of the Debtor for the limited purpose of protecting and preserving director and officer liability claims in the best interests of the bankruptcy estate including investigating and, to the extent appropriate, asserting claims against former officers and directors of the Debtor. The appointment is effective immediately upon entry of this Order.

3.    Mr. Kenigsberg shall be compensated on an hourly basis at standard rates in effect at the time services are rendered and pursuant to 11 U.S.C. §§ 328(a) and 330.

###

**Geoffrey S Aaronson** shall serve a copy of this order on the United States Trustee and all parties who have filed appearances in this case and shall file a certificate of service thereof.